Bruce R. **RIPPEY** and A. Gordon Rippey,
Plaintiffs,

v.

**DENVER UNITED STATES NATIONAL
BANK**, a national banking association,
Helen Bonfils Davis, and the Denver
Post, Inc., a Colorado corporation, Defendants.

Civ. A. No. 66–C–359.

United States District Court
D. Colorado.

Oct. 16, 1967.

See also D.C., 42 F.R.D. 316.

Dawson, Nagel, Sherman & Howard, by Samuel S. Sherman, Jr., Raymond J. Turner, Winner, Berge, Martin & Camfield, by Fred M. Winner, Denver, Colo., for plaintiffs.

Akolt, Shepherd & Dick, by J. H. Shepherd, Lawrence W. DeMuth, Jr., Davis, Graham & Stubbs, by Richard M. Davis, Robert H. Harry, Thomas S. Nichols, Richard P. Holme, Denver, Colo., for defendant Denver United States Natl. Bank.

Holland & Hart, by J. G. Holland, William C. McClearn, Edwin S. Kahn, Denver, Colo., for defendants Helen Bonfils Davis and Denver Post, Inc.

## FACTS AND OPINION

WILLIAM E. DOYLE, District Judge.

This case was tried to the court without a jury commencing on July 24, 1967 and concluding on August 8, 1967. Thereafter briefs were submitted; the final brief having been filed on September 25, 1967, and the cause now stands submitted. The evidence herein is voluminous and although it will not be described in minute detail much of it will be considered and treated so as to furnish a basis for decision. The facts which are herein narrated are to be regarded as findings unless otherwise indicated. Separate formal findings as to the more important facts are appended hereto.

### Description of the Contentions and Issues

The action is brought by two of several beneficiaries of the Agnes Reid Tammen Trust which for convenience will be referred to as the "Tammen Trust." They attack the sale by the trustee, defendant Denver United States National Bank of 17,705 shares of stock of The Denver Post, Inc. to the defendant Helen G. Bonfils for the sum of $300.00 per share. They assert that this sale

was for various reasons in breach of trust—that had the market been tested in accordance with orthodox trust practice the trust would have received $500.00 per share; that S. I. Newhouse was a potential purchaser known to the Bank as such and that the Bank's failure to explore this source of purchase together with other attendant circumstances subjects it to surcharge for the amount which could have been realized had it followed out the demands of good trustee practice. A further count of the complaint alleges the existence of an unlawful conspiracy between the Bank, The Denver Post, Inc. and Miss Bonfils to sell the stock to Miss Bonfils to the exclusion of S. I. Newhouse in breach of the Bank's fiduciary duty.

Plaintiffs alternatively seek rescission of the entire transaction and the resale of the stock at public auction. It is alleged that Miss Bonfils purchased with knowledge that the stock was sold in breach of trust and that consequently she is not a bona fide purchaser; that she is subject to a rescission decree.

The Bank's position is a vehement denial that it acted pursuant to an illegal plan or scheme or in breach of trust. It denies that it committed any breach of trust; it maintains that it exercised the utmost good faith in all of its dealings and that the result was favorable—that the price realized was far in excess of any price ever paid at any previous sale; that it exceeded actual value and was highly beneficial to the trust.

Helen Bonfils and The Denver Post, Inc. deny any scheme or device to injure or defraud the plaintiffs—Miss Bonfils alleges that as a daughter of the co-founder of The Post she had a valid interest in purchasing the stock and in preventing any other adverse interest from coming into it. The claim is that Miss Bonfils paid a fair price for the stock and purchased it following hard bargaining. Her further contention is that she was not a party to any breach of trust—that she was a good faith purchaser entitled to seek a favorable bar-

gain and is not subject to a decree of rescission.

Although the stock which has given rise to this case is a minority interest ownership of which could not vest control, nevertheless, it is the competition for control of The Denver Post which has furnished the incentive for purchase by Miss Bonfils and the Post management group so as to prevent S. I. Newhouse, the owner of a publications chain, from gaining this block as a stepping stone toward control. Thus, a struggle for control is an underlying factor present and apparent in the case.

### Summary of the Events which Preceded the Filing of this Action

The stock of The Denver Post, Inc. has always been closely held. Originally it was all owned equally by the founders of The Denver Post newspaper, H. H. Tammen and F. G. Bonfils. When Tammen died in 1924 he left one-half of his estate including a large block of Denver Post stock to his wife and the remaining one-half to The Denver National Bank in trust for the Childrens Hospital. The H. H. Tammen Trust held the Post shares (about 20%) until 1960 at which time it sold them to The Denver Post, Inc. for $260.00 per share.

Agnes Reid Tammen died in 1942. Her will created a testamentary trust naming E. Ray Campbell, a prominent lawyer, and Sadie Schultz as trustees and the defendant Bank as successor trustee. Under the terms of her will the income was to be paid to certain life beneficiaries and the remainder to the descendants of Helen Crabbs Rippey. Mrs. Rippey is the only surviving life beneficiary. This trust was the holder of the stock (some 17,705 shares or 22%) which is the subject of the present litigation.

The will contains extremely broad powers of sale of the specific stock here in question together with all other assets held in trust. The trustees are authorized to retain and sell at their own discretion and without consulting the bene-

ficiaries or "without regard to the opinion or desire or judgment of the beneficiaries." It further empowers the trustees:

"1. To vote said stock and exercise all rights pertaining thereto, with full control and dominion over the same, and to enter into any lawful voting trust or agreement or agreements with other stockholders of said company or companies for the holding or sale of all or any part of said stock of said company or companies, which in the sole judgment of the said Trustee will promote the best interest of the said company or companies and the beneficiaries in this Article named, and procure the best price for said stock in the event of the sale thereof.

"2. To sell at private sale, without advertisement or notice to any one, and without the aid or necessity of any court order, and without any obligation on the part of the purchaser or purchasers to see to the disposition of the proceeds of the sale, all or any part of said stock, at such price and upon such terms as to credit or otherwise as the Trustee shall determine."

A further provision (Article XV) expounds additionally the authority of the trustees to retain or sell at private sale without notice and without consent of any beneficiary and without any court order or approval and further provides that the trustees "shall be free from liability for depreciation or loss through errors of judgment; * * *" It then goes on to provide in the same article but in a new sub-paragraph an exculpatory clause as follows:

"My Executors and Trustees shall only be liable hereunder each for his own fraudulent acts. They shall be permitted to employ and compensate, out of the principal or income of the estate or trust estate funds, agents, bookkeepers, brokers, attorneys and assistants as deemed necessary by them for the proper administration of the estate or trust estates, as the case may be, and without liability for neglect, omission, misconduct or default of any such person so employed with reasonable care."

During the tenure of E. Ray Campbell there was no threat of sale of the Agnes Reid Tammen stock.[1] Mr. Campbell was for many years president and general counsel of The Denver Post, Inc. and he took the position that the stock was not for sale at any price—this despite the fact that the beneficiaries, the Rippeys, were continuously urging sale because the dividends were low in relation to the value as indicated by potential sale price. The Agnes Reid Tammen trust instrument which was drafted by E. Ray Campbell provided that upon the death or resignation of the trustees, the Denver National Bank, predecessor of the defendant Bank, would become the successor trustee.

The Rippeys, although for many years dissatisfied with the earnings of The Denver Post, Inc., did not take legal action so long as E. Ray Campbell continued as trustee. However, he resigned as trustee and as an officer of The Denver Post, Inc. on May 19, 1966, and this occurrence precipitated the flurry of events which culminated in the filing of this action.

About this time representatives of the Defendant Bank met with the Post management group and were persuaded to accept the trust and simultaneously were told of the desire of Helen Bonfils or of the Post to purchase the stock held by the Trust and were told also of her not wishing to become embroiled in a bidding competition with S. I. Newhouse in order to obtain it.

On May 25, 1966, the Bank became the successor trustee. It decided at the outset that the stock had to be sold and also decided to sell to Miss Bonfils exclusively. It then proceeded to negotiate

1. The will gave to the trustees a broad authority to retain the stock and also had a forfeiture clause sometimes called an "in terrorem clause" which threatened dire consequences to any legatee or beneficiary for contesting the will or disposition of the estate including any of the trust provisions.

a sale to Helen Bonfils and finally concluded it on June 22, 1966. There were intense negotiations as to *price* prior to reaching an agreement to sell (on or about June 20, 1966) for $300.00 per share. The Bank made no effort to sell or to offer the stock to Newhouse. Indeed on June 7, 1966, it entered into a minority shareholders' agreement with Miss Bonfils and the F. G. Bonfils Trust which precluded any such effort for a period of one year.[2] On learning of this Newhouse sent a telegram to the Bank in which he offered to pay $500.00 per share for all of the stock held by the signers of the minority shareholders' agreement. This block of stock amounted to about two-thirds of the total issued and outstanding, and together with stock which he had previously purchased would have given Newhouse virtual ownership of the corporation. This offer did not reach the Bank until after the sale to Miss Bonfils had been practically completed.

## JURISDICTION

The Plaintiffs are the sons of Helen Rippey, and are remaindermen of the income and corpus of the trust. They are citizens of Oklahoma and Maryland and our jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Defendants have questioned our jurisdiction by motions to dismiss on two different occasions contending that Helen Rippey the life beneficiary who is a Colorado resident is an indispensable party whose presence would defeat our jurisdiction. Rippey v. Denver United States National Bank, D.C., 260 F.Supp. 704, and see our supplemental memorandum rendered July 3, 1967, 42 F.R.D. 316.

The jurisdictional issue has been reasserted at the trial. We adhere to our

prior rulings and conclude without repeating the reasons in detail which are set forth in the cited opinions that there is jurisdiction over both parties and subject matter and that Helen Crabbs Rippey need not be joined as a party in order to effectively determine the merits of the cause.

This suit was commenced on July 12, 1966, a few weeks after the sale. It was instituted by Bruce R. and A. Gordon Rippey, residents of Maryland and Oklahoma respectively, sons of Helen Crabbs Rippey, the surviving life tenant as Plaintiffs. Almost immediately, (July 22, 1966) the Bank instituted a proceeding in the Probate Court of the City and County of Denver. The Bank had previously cut off and withheld the income payable to Helen Crabbs Rippey on the theory that she had "instigated" this case at bar. This action was taken under the "in terrorem" or forfeiture clause of the Agnes Reid Tammen will (Article XVII). The Plaintiffs here removed that cause as it applied to them to this Court on August 9, 1966. The Bank of course moved to remand to the Probate Court of Denver. This Court granted that motion on the ground that the attempted application of the forfeiture clause to the Rippey brothers was not a separate or independent claim or cause of action within the meaning of 28 U.S.C. § 1441(c), D.C., 260 F.Supp. 717. It is noteworthy. that subsequently the Probate Court ruled that the forfeiture clause was not applicable to this action. Defendants renewed their motion to dismiss after the Probate Court construed the clause. The basis was that the forfeiture clause was no longer a factor which weighed on the side of Helen Rippey being dispensable. By that time all

**2.** The minority shareholders' agreement of 1966 provides in pertinent part as follows:

"1. As an inducement to each of the parties hereto not to sell the shares held by them, none of the parties hereto will sell, assign or otherwise dispose of, or agree to sell, assign or otherwise dispose of, all or any part of the shares of the capital stock of The Denver Post,

Inc. so held by any of them, except to another party to this Agreement, unless all shares of such stock held by all parties hereto are sold at the same price and upon the same conditions and unless all other stockholders of said corporation are afforded an opportunity to sell their shares on the same terms and conditions."

discovery was finished and the case was ready for trial. We held that defendants' equities under revised Rule 19 had not been enhanced by the ruling whereby we at that stage could or should have dismissed the complaint.

*Status of the Post Stock Prior to the Sale as of May 1, 1966*

It will aid in bringing the issues into perspective to show the shareholdings of Post stock just prior to the sale.

| | Number of Shares | (77.928.4525 Shares) Authorized Stk on which Dividends are paid | (94.015 Shares) % of Total Stock Outstanding Treasury |
|---|---|---|---|
| Helen G. Bonfils | 16,389.2602 | 21.0312% | 17.4326% |
| FNB-KC as Trustee: H. G. Bonfils | 1,468.9436 | 1.8850% | 1.5625% |
| Frederick G. Bonfils Foundation | 5,028.7800 | 6.4530% | 5.3489% |
| Denver U. S. National Bank and First National Bank of Kansas City co-trustees: F. G. Bonfils Trust | 17,513.6986 | 22.4741 | 18.6286% |
| E. Palmer Hoyt | 1.0000 | .0013 | .0011% |
| E. Ray Campbell-Trustee Agnes R. Tammen | 17,704.6487 | 22.7191 | 18.8317% |
| E. Ray Campbell | 1.0000 | .0013 | .0011% |
| Charles E. Stanton | 10.0000 | .0128 | .0106% |
| The Herald Company- (S. I. Newhouse) Sub: 72,841.3525) | 14,724.0214 | 18.8943 | 15.6614% |
| Denver Post Employees Stock Trust | 5,087.1000 | 6.5279 | 5.4109% |
| Sub Total | 77,928.4525 | 100% | |
| Denver Post TREASURY STOCK | 16,086.5475 | | 17.1106% |
| TOTAL | 94,015.0000 | . | 100% |

The stock listed as Denver Post Treasury Stock plus that in the Employees Stock Trust is the stock which was purchased by the Post from the Bank in 1960. It is here called the Childrens Hospital Stock.

As of May 1, 1960, prior to this sale, Miss Bonfils owned outright 21.0321%

of the total non-treasury stock. In addition through the F. G. Bonfils Foundation, and the Helen Bonfils Trust and the Denver Post Employer Stock Trust she had control of an additional 14.8659. Thus the stock which was directly under her control amounted to 35.8971%. She also had access to the 22.4741% held by the First National Bank of Kansas City and the Denver U. S. in the Frederick G. Bonfils Trust. This gave her control. During the tenure of E. Ray Campbell she could also count shares in suit.

It is apparent that the two blocks of stock held in trust, i. e., that in the F. G. Bonfils Trust together with that in the Agnes Reid Tammen Trust were and continue to be crucial to control of the Post. Ownership by Newhouse would give him control. Therefore, the acquisition of the Tammen Shares and prevention of purchase by Newhouse was a matter of deep concern to Miss Bonfils and the Post group. Acquisition of these shares was also of great importance to S. I. Newhouse. It would not only have given Newhouse a place on the Board it would also have placed him in a position to seek to force a sale of the F. G. Bonfils block, acquisition of which would have given him control.

### THE SALE TO MISS BONFILS

Most of the basic happenings surrounding the stock sale are not disputed. The parties do, however, draw some different inferences and conclusions from them. A chronology of the more important events leading to the sale reveals the following:

Immediately before E. Ray Campbell decided to retire, effective May 19, 1966, his lawyer (the lawyer for the Agnes R. Tammen Trust) notified Arch Metzner, Vice-President and Trust Officer for the Bank of this impending resignation. Thereafter on May 18 Metzner, Richard Davis, attorney for the Bank, Palmer Hoyt, editor and publisher of the Denver Post, Donald Seawell, representative of Miss Bonfils and Charles Buxton, business manager of the Post met at Davis'

office. The purpose of this was to advise that Campbell would be resigning; that the Post group knew the Bank would be taking over as trustee and that they (the Post) wished to purchase at $260.00 per share.[3] The Post representatives further said that it was important to them to obtain the Agnes Reid Tammen block of stock prior to the annual meeting scheduled for June 8, 1966 because Newhouse might attend the meeting and make an offer. It was explained that Newhouse was desirous of getting control of the Post and that he might pay anything; that money didn't mean a thing to him. The Bank was assured by the Post people that the will had broad powers of sale and that the forfeiture clause could be invoked if there was any criticism from the beneficiaries.

In an effort to determine the value of the Post stock, the Bank set about reviewing its evaluation information acquired in connection with the 1960 sale. It did this through members of its own staff who had generally kept in touch with the stock during the intervening years. The staff reached a tentative conclusion on or about June 3, 1966, based on the 1960 sale price of $260.00 that due to the purchase and redemption of the Childrens Hospital shares, the Tammen stock considered on an arithmetic comparison had a then value of $313.00. This conclusion was based almost wholly on the reduction of the number of outstanding shares and the increase in total percentage of all outstanding shares including those of the Agnes Reid Tammen shares.

Roger Knight, Jr., Chairman of the Board, appointed a special advisory committee consisting of prominent members of the Bank's Board of Directors to counsel him in connection with the sale.

On May 25, 1966, Helen Bonfils sent a formal offer of $260.00 per share to the Bank. In her telegram she stressed the importance of completing the transaction at the "earliest possible moment."

3. This was the price paid by the Post for the Childrens Hospital shares in 1960.

On May 27 the Bank proposed that there be a minority stockholders' agreement between the F. G. Bonfils Trust, the Agnes Reid Tammen Trust and Helen Bonfils. The purpose of this, according to the Bank, was to protect it from getting into an isolated minority position. Bank witnesses testified that they were acutely aware of the power struggle between the Post and Newhouse. At this time the three shareholder signatories held the following:

| | | | |
|---|---|---|---|
| Helen G. Bonfils | 16,389.2606 | or | 21.0312% |
| Denver U. S. National Bank and First National Bank of Kansas City (Bonfils Trust) | 17,513.6986 | or | 22.474% |
| Denver U. S. National Bank | 17,704.6487 | or | 22.7191% |

◆

A contract between these shareholders was executed on June 7, 1966. The signers undertook to hold, maintain or sell as a block and promised not to sell to anyone except the parties to the agreement unless all of the shares were sold for the same price and on the same terms. The duration of this accord was one year. (See footnote 2).

On June 2, Mr. Sherman, the attorney for Mrs. Helen Rippey and the other beneficiaries and who was unaware of the impending sale, called Metzner to discuss the succession of the Bank as trustee. After this conversation Metzner and Sherman met on June 7, 1966. Sherman was told that the Bank was in the middle of an evaluation. The tentative figures were mentioned and Sherman was told that Helen Bonfils was anxious to purchase the stock and would pay $260.00 per share. Sherman was not told that the Bank had entered the restrictive shareholders' agreement (which effectively eliminated Newhouse as a prospective purchaser).

There was a further conference between Metzner and Sherman and Mr. and Mrs. Rippey on June 15 and 16. On this occasion the sale was discussed in some detail with possible prices being mentioned. Metzner disclosed that the minority shareholders' agreement had been executed.

The Rippeys as well as Sherman expressed strong opposition to the manner of proceeding with the sale and particularly to the restrictive agreement. They were not told that a sale was imminent. They were instead led to believe that it would not occur for several weeks—after the valuation study was completed.

After this meeting (of June 17) Sherman wrote a letter expressing opposition to this agreement, further stating that the Bank could fulfill its fiduciary duty only if effort were made to sell at public sale by sealed bids. Reference was made to several possible purchasers. The letter also requested that if the Bank were determined to sell at an agreed price that it notify Sherman as attorney for Mrs. Rippey so as to afford an opportunity to seek out a higher cash price.

The Bank did not reply to this letter. Metzner testified that following receipt of it he regarded the Rippeys as adversaries. He added that it was not uncommon for a trustee to find itself at odds with its beneficiaries.

The Bank transmitted a copy of this letter to representatives of the Post and Miss Bonfils, but did not further communicate with Sherman or the beneficiaries until after the stock was actually sold. Seemingly this letter, whether intended or not, had the effect of bringing about an increase in the Post's offer because of apprehension that Newhouse would enter the picture.

It is unnecessary to describe in detail the meetings between the various officers and directors of the Bank or the meetings of the special advisory committee or the bargaining sessions between the Bank and the Post, and there were many such meetings prior to June 20–22nd when the stock was finally sold. The evidence establishes that a serious effort by both sides had been made to complete the purchase on June 6, prior to the annual meeting of Post shareholders. On that date the previous offer was raised by Seawell on behalf of Miss Bonfils from $260.00 to $275.00. In fact, through misunderstanding Metzner and Seawell believed that an agreement had been reached. Seawell then had in mind a figure of $275.00 while Metzner was thinking of $313.00. This of course fell through and on June 8 Metzner offered to sell on behalf of the Bank for the sum of $300.00 per share. Seawell refused this and reoffered to buy for $275.00 and Metzner then revoked his $300.00 offer. After the Post annual meeting (on June 8) the negotiations continued. The Bank's financial analysts and those of the Post met to exchange information and viewpoints. Following the receipt of the Sherman letter (described above) the Post on or about June 18 decided that it was willing to pay $300.00. This was communicated to the Bank on June 20. The special Bank committee considered it and decided to accept the offer and the sale was consummated on June 22nd.

As part of the sale Miss Bonfils gave to the Bank an indemnity agreement whereby she undertook to indemnify the Bank and save it harmless for any and all loss including costs and expenses of suit which it might suffer as a result of the sale of the stock. The agreement contained other provisions not here important relative to giving of notice, control of litigation, etc. Bank officials said that they did not bargain for this and did not regard it as necessary but accepted it because it was offered.[4]

The sale was closed on June 22, 1966 and on that occasion a down payment of in excess of $500,000 [5] was paid. The balance amounting to some $4,800,000.00 was paid on June 24, 1966, once financing was arranged.

The Newhouse offer of $500.00 per share for the entire block of stock embraced in the restrictive agreement was not received until June 23, 1966, the day after the closing. The telegram carrying the offer dated June 22, 1966 was misdirected and delayed.

Evidence was received (at the trial) showing willingness of Newhouse to purchase the Tammen shares alone for the sum of $450.00 per share. This is shown in a contemporaneous letter from Sherman dated June 23, 1966. It is also confirmed in the deposition of Newhouse who stated that at the time he had been willing to pay this for the Tammen shares but had later decided to *offer* $500.00 per share for the control block.

4. The indemnity agreement undertook in broad terms to protect the Bank from and against any all actions or causes of action, claims, demands, suits, liabilities, loss damage, costs or expenses—including attorney fees and expenses, "which said Denver United States National Bank or its officers, directors, agents, employees, successors or assigns shall or may at any time sustain, suffer or incur, without limitation as to time or amount except as hereinafter provided, arising out of or in any manner connected with the sale and purchase of said 17,705.6487 shares of the capital stock of The Denver Post, Inc., under the terms of said Agreement between the parties of even date herewith, or which it or they may sustain, suffer or incur in connection with any litigation, investigation, or other expenditures incident to such sale and purchase except any such costs or expenses, and counsel or attorneys' fees incident to the negotiation, drafting, execution or enforcement of this Agreement and Indemnity Agreement."

5. This came out of Post funds. It was an advance to Miss Bonfils which was paid back a few days later. Although plaintiffs seek to emphasize this as some kind of wrongdoing, it does not appear to have any relevancy to the issues which we are trying.

### Knowledge of the Bank and Post that Newhouse was a Potential Purchaser

The interest of S. I. Newhouse in acquiring Post stock and eventually gaining control was well known to both the Bank and the Post management group as early as 1959 at which time Newhouse approached Helen Bonfils who was even then the largest shareholder. Subsequently he sought to purchase the Children's Hospital shares from the Bank. He was at all times represented in this effort by a newspaper broker, one Kander and locally by Keith Anderson, a Denver lawyer. Anderson and Kander had somewhat of a continuing commission to obtain such blocks of stock as were available. In the spring of 1960 Newhouse made various offers. First he offered $10,000,000.00 for 55%. Later he raised it to $228.00 and finally in later April and early May he offered $240.00 per share. The latter was accepted by May Bonfils Stanton and The First National Bank of Denver (which held a small group of shares in trust). As a result of these purchases Newhouse then held about 15.7% which as of the time of this suit became approximately 18% plus.[6] Mr. Newhouse did not because of his minority holdings lose interest in the Post. He continuously resisted efforts of Miss Bonfils to acquire his shares and bided his time until he could buy more. He kept in touch with the Post as a shareholder and was kept advised of conditions by his representatives. From time to time Keith Anderson assured the Bank of his willingness to pay more than he paid previously and in fact he had promised to pay May Bonfils Stanton any additional amount which he would pay in acquiring additional shares. The Post management group was well aware of Newhouse's various efforts. In fact he had communicated his wishes to E. Palmer Hoyt, publisher of the Post on several occasions. On the other hand Helen Bonfils had repeatedly demonstrated an intense interest in retention of her shares and had shown a commitment to prevent Newhouse from acquiring more shares and gaining a place on the Board. Thus there existed more than a competition between these two potential purchasers. The condition was accurately described by Bank witnesses as a struggle for power or control. The Bank had been aware of it during the 1960–1966 period because of its having held the Children's Hospital shares until 1960 and because of its joint holding with The First National Bank of Kansas City of the F. G. Bonfils shares. Furthermore, on the occasion of the May 19, 1966 meeting between Bank representatives and Post representatives the Bank was made aware of the Post's concern about Newhouse and a possible bidding contest.

The Newhouse documents in turn show that he was committed from 1960 forward to gaining a controlling interest in Post stock. The preferred means of getting it was his outright purchase of the only two blocks available, that is, that held by the Bank in conjunction with the Kansas City Bank, the F. G. Bonfils trust shares, and the Tammen block here in issue. The Newhouse aides considered every possible means of forcing a sale, but a stalemate existed until May 1966 due to the unwillingness of Campbell to sell and the commitment of The First National Bank of Kansas City not to sell the F. G. Bonfils shares contrary to the wishes of Miss Bonfils. There was apparent willingness on the part of Mr. Newhouse to purchase a minority interest as he did when he purchased the Bonfils-Stanton shares *if* it promised to help his ultimate objective of control.

Although the Bank was fully cognizant prior to the instant stock sale of the presence of Newhouse and of his intense commitment to purchase Post stock and ultimately to control the paper, there was no *actual* knowledge prior to July 22–23 that he might be willing to pay an extraordinarily high price such as $450.00

---

6. This increase in percentage was due to the fact that the Children's Hospital shares had been purchased by the Post and had been retired.

or $500.00 per share. Previously he had paid $240.00 for the May Bonfils block and although there were indications of willingness to pay more there was no tangible evidence of such willingness prior to July 23, 1966.

### The Evidence Re Alleged Undue Influence

Plaintiffs charge that the Bank was apprehensive about dealing with Newhouse or soliciting an offer from him because they had been overpowered or awed by the Post management group and were reluctant to offend them.

From the time that the Bank was first contacted around the middle of May 1966, the Post representatives, consisting of Palmer Hoyt and Donald Seawell, made it clear to the Bank representatives that they wished to buy the stock at the lowest price possible and at the same time to prevent Newhouse from buying it. Hoyt admittedly exercised pressure on the Bank, talking to various of the directors and former directors with whom he had personal influence. This was not done surreptitiously and there were no expressed threats of reprisal aimed at the Bank or its officers. There was, however, what a bank officer described as a "sales pitch" and the need for haste to complete the sale was continuously stressed. Hoyt complained to the Bank Board Chairman, Roger Knight, that the Trust Department was unreasonable and uncooperative to the Denver Post analysts in completing its value study. There is mentioned in the record from time to time that the Bank officers might have been apprehensive about Post vindictiveness, but the most that can be said is that these officers seemed somewhat solicitous toward the Post. We see no evidence of undue influence.

### Evidence of Value

On the question of the value of the Tammen stock on June 22, 1966, the plaintiffs relied wholly on the testimony as to the willingness of Newhouse to pay $500.00 for control or $450.00 for the Tammen shares. They did not introduce any independent evidence with one exception. They called Miss Ashby, the Bank's Chief Stock Analyst, as an adverse witness and questioned her at length. She testified that she had evaluated the Post stock first in 1960 when the Bank sold the Children's Hospital shares. From this time until 1966 she kept in touch with the Post shares and so had a file in May 1966 which furnished a basis for a tentative opinion. After the preliminary negotiations broke down she undertook, in conjunction with the Post financial experts, to carry out a detailed and comparative study of the Post stock. While she was carrying out her study the sale was completed. However, she continued her analysis and finally completed the report some thirty days later. Her method involved consideration of the tangible property and a determination of book value of the shares, the earnings history, growth trend, comparison with other newspapers, including prior Post stock sales and stock sales of other comparable newspapers. From all of this data she arrived at a price-earnings multiple. This was applied to average earnings per share and the result was the reasonable value. Her conclusion was that the fair value of the stock was $219.00 per share (Book value was figured at less than $100.00 per share). She considered the $300.00 per share sale price a premium amount.

The Bank called an outside expert, one Ralph Badger, who was also shown to have made a careful and detailed study of the Post and of the Post stock. He followed much the same price-earnings approach as Miss Ashby and arrived at substantially similar results. He also concluded that the reasonable value of the stock was much less than the $300.00 sales price, but took into account the particular interest of the prospective purchasers and concluded that the reasonable value per share was in the range from $275.00 to $300.00. Badger did point out that at $300.00 per share the Post earnings were, in fact, but 2.6%.

This testimony is entitled to limited credit except that it gives us a comparative standard. It virtually ignores the presence of the two intensely interested buyers. Both experts gave opinions based on ordinary purchasers and ordinary market conditions considering the actual or intrinsic value of the stock. This objective approach was unrealistic in this case. It is questionable whether newspaper stock is ever purchased on such a basis and certainly the competing buyers in the instant case were not seeking an investment. Control and finally influence was the object. Mr. Newhouse wished to round out his empire whereas Miss Bonfils desired to retain the paper's local control and character. Such motives are not susceptible to objective valuation. Actual testing of the market was the only means of determining price in these circumstances.

### The Bank's Contention that it Acted Prudently

As a justification for its action in selling to Miss Bonfils to the exclusion of Newhouse, the Bank stresses that the result was favorable to the Trust in that the price was higher than any previously obtained and was fair in relation to the intrinsic value of the stock. The Bank also stresses that it acted within the broad powers conferred on it under the will. As to its failure to contact Newhouse the Bank claims that this was a judgment call and within its discretion. They (Bank's counsel) argue that the situation in which the Bank found itself was one of dilemma—that there were risks in each direction and that they had to balance these risks and decide on the least hazardous course and that a good faith decision in such circumstances is not negligence. The Bank, according to the testimony was apprehensive that if it contacted Newhouse and the Post learned of it the result might be that there would be no purchasers, and that it regarded the safe course to be negotiation with a certain purchaser to obtain a fair price. Mr. Newhouse might give a negative response. Miss Bonfils would no longer pay a premium price. Miss Bonfils' illness might take her out as a purchaser or she might decide to sell her interests to Newhouse. These and other perils they claim to have weighed and considered, including the possibility that Newhouse would make a lower offer (than $300.00 per share) and that their bargaining position with Miss Bonfils would be destroyed. In the end it was decided to deal with the in or management group and to sell the stock to Bonfils.

The Bank officers called as witnesses testified that it was sound business practice to negotiate with a single buyer in circumstances such as this, and not good practice to encourage competitive bidding; that when an interested buyer is found for a business or the stock of a corporation it is good business practice to negotiate with that purchaser to the exclusion of other possible purchasers; that in this instance they were negotiating with the management or control group who were certain to purchase and to pay a fair price and the safe course— that which would avoid the risk of possibly having to sell for a lesser price was to bargain exclusively and finally sell to it.

### Factual Contentions of Miss Bonfils

In support of her position that she was a bona fide purchaser, Miss Bonfils maintains that the sale here was authorized under provisions of the will which vested a broad discretion in the trustee, and that since private sale was authorized on a discretionary basis she cannot in law be a bad faith purchaser— that the trustee had the responsibility of discharging its duty to obtain the best price available and she had the right to pursue her own interest to buy for the most favorable price for which she could get it.

Miss Bonfils also offered evidence to show that her motives were valid. She did not testify. Her position was revealed through her attorney, by various documents together with the surrounding circumstances. According to this she sought to retain control of the Post so as to carry out her father's wish that

the paper remain locally controlled and not become an outlet in a chain. She also wished to leave a family contribution to the community. To this end it appeared that she has taken steps to insure that its local ownership will be permanent by making available the treasury shares purchased from the Childrens Hospital Trust for employee purchase at a low price per share. This is a plan similar to one adopted by the Milwaukee Journal. The employees are the beneficial holders of the stock during their lifetime. When they resign or die, it reverts (by purchase) back to the trust for reissue. A self-perpetuating board administers the program and votes the stock. This allows the employees to participate in ownership and to realize income and growth and also insures against an outside chain interest gaining access to shares and ultimate control. The shares in suit have been transferred to the Helen Bonfils foundation and are intended ultimately to be appropriated to the employee trust.

As to the present shares she argues (as indicated) she was dealing at arm's length with the Bank; that the purchase price resulted from hard bargaining and that as a purchaser she had the right to buy the stock at the lowest obtainable price without regard to a fiduciary duty of the Bank to obtain the best price obtainable; that she owed no obligation to become embroiled in a bidding contest so as to enable the trust to get more money; that she had the right to pursue her own interest and to expect the Bank to take care of its interest. She denies that there was any conspiracy to injure anyone.

### Evidence as to the Alleged Conspiracy

Plaintiffs point to various bits and pieces of evidence in an effort to establish that the transaction was influenced by insider persuasion or pressure. This is in support of their contention that the Post and Miss Bonfils unlawfully conspired with the Bank to injure plaintiffs. One of the Board members, Mr. Ricketson, was also appointed to the Board Chairman's special advisory committee relative to the sale of the stock. Ricketson was in addition a long-time friend of Palmer Hoyt and Miss Bonfils. In 1960 when the Employee Stock Plan was being set up, Ricketson advised Hoyt to employ as a tax lawyer Stephen H. Hart, who was also on the Board of the Bank. Hart continued as the Post counsel and took part in negotiating the present sale. However, he disqualified himself from participation as a Board member and fully disclosed his interest to the Bank. While the present transaction was in negotiation, Ricketson talked to Hoyt from time to time but did not disclose that he was a member of the special committee. Ricketson was strongly committed to sale of the stock to the Post group but not any more so than other Board members.

The offices of Mr. Chris Dobbins who had been on the Board of the Bank were also utilized by Mr. Hoyt. Dobbins called a meeting of Bank and Post officers in an effort to facilitate a sale.

■ This evidence of a conspiracy does not rise higher than suspicious circumstances. At most it shows an aggressive effort by Mr. Hoyt. He sought, it is true, to exercise personal and newspaper influence but the efforts on the part of the Post were straightforward and open and do not disclose the existence of any fraudulent or diabolical confederation designed to injure plaintiffs.

### The 1960 Sale

Some mention must be made of the evidence presented relative to the facts surrounding the sale by the Bank in 1960 of the Childrens Hospital block of stock. This was offered by plaintiffs in an effort to prove knowledge of Newhouse and to contrast the actions of the Bank on that occasion with its present actions and so as to demonstrate their then and presumably present knowledge of the duties of a fiduciary in the sale of trust property.

The stock sold in 1960 derived, as did the stock here in question, from the Tammen estate. It was held in trust by

the defendant Bank for the benefit of Childrens Hospital Association. The officers of that association had for many years been dissatisfied with dividends received and had consistently urged that it be sold. The Bank had for some time recognized that it should be sold, but was uncertain as to how to proceed. It considered a public offering inadvisable believing that it would cheapen the stock. So when Mr. Newhouse made an offer to pay $10,000,000.00 for 55% in April, the Bank, acting through a different group of officers, concluded that it should make an intense effort to sell. Mr. Campbell was approached and he sought to persuade the Bank to retain it. It was not until Mr. Newhouse increased his offer to $240.00 per share that Campbell and the Post became concerned. A restrictive agreement between the shareholders having minority blocks of stock available was then entered into to protect each from becoming an isolated minority. This has been described as a first refusal agreement. Each shareholder undertook not to accept an offer to purchase his stock unless the purchaser offered in writing for 30 days to purchase the stock of each of the other parties to the agreement on the same terms.[7]

The Bank at last sold the shares to the Post for $260.00 per share and although it did not seek open competition bidding or sealed bids, it did communicate with Newhouse and in a quiet way at least sought the highest price it could obtain regardless of the identity of the purchaser. The Post was favored somewhat, but there was not as in the present instance a commitment to sell to it and to exclude Mr. Newhouse as a purchaser. Thus, the circumstances and atmosphere of the 1960 sale were quite different from those which surrounded the present one. The Bank acted more independently and showed awareness of its fiduciary duties.

### Summary of the Ruling

1. The first duty of a fiduciary is to protect the interests of its beneficiaries. In selling an asset of the trust he must make every reasonable effort to sell at the best price obtainable. It is a violation of the fiduciary duty to sell at a private sale to one purchaser to the exclusion of another known interested purchaser who would foreseeably pay more. The Bank's failure to make any effort to contact Mr. Newhouse and its determined effort to sell to Miss Bonfils without regard to consequences, which determination is evidenced by the exclusive shareholders' agreement together with its other actions which were designed to complete the sale without either contacting Mr. Newhouse or affording opportunity for Newhouse to make an offer, constituted a breach of trust.

2. The appropriate remedy is surcharge, rather than rescission. The plaintiffs have stated a preference for the remedy of rescission and resale, however, there has not been an unequivocal election to seek rescission. The request has been alternative. Mr. Newhouse is not before the court and has not made any binding offer; hence there is no assurance that the trust would benefit from such a decree. Furthermore, the measure of relief which the plaintiffs are entitled to have in this type of breach is the difference between the sale price and the price which would have been obtained if the Bank had conducted a

7. The restrictive agreement which was entered into in 1960 was less restrictive. It was in the nature of a first refusal. It provided:

"1. That as an inducement to each of the parties hereto not to sell the shares held by it, none of them will sell, assign or otherwise dispose of all or any part of the shares * * * without requiring, as a condition to such sale or other disposition, that the purchaser or other transferee of such shares shall offer in writing, good and binding for a period of thirty (30) full business days, to purchase all shares of such stock held by the other parties hereto, at the same price and upon the same terms and conditions as offered to the other party or parties hereto."

non-restricted sale. This measure can be best realized by awarding damages. If plaintiffs are correct in their predictions that Mr. Newhouse would pay as much as $1,000.00 per share the trust would obtain a measure far in excess of that provided by law in the type of breach of trust here presented (non-fraudulent).

■ 3. As noted above the proper measure of recovery in circumstances like the present is out of pocket loss as of the time of sale. There is substantial evidence that Mr. Newhouse would have paid the sum of $450.00 per share for the Agnes Reid Tammen shares if he had been given the opportunity to purchase them. Therefore, plaintiffs are entitled to recover for and on behalf of the Trust the sum of $150.00 per share the same being the difference between the $300.00 purchase price and the sum which probably would have been obtained had the Bank carried out its fiduciary duty.

4. Mr. Newhouse is not a party to this suit although his presence as a possible bidder has enhanced the sale price of the shares in question. He does not have any rights in this case either legal or equitable. Therefore, in fashioning the appropriate remedy and measure of recovery we cannot properly consider the interests which he seeks to advance. He alone would probably gain an advantage from the grant of rescission. This is not and cannot be a factor in our decision.

## I

### The Breach of Trust Question

The plaintiffs advance a number of theories and arguments in support of their allegation that the Bank violated its trust in making the instant sale. They point to the restrictive agreement, the indemnity agreement, the failure to furnish information as to the terms and progress of the sale to the beneficiaries as well as the failure to test the market and to obtain the highest price obtain-

able for the stock. These several acts are related and considered in totality to evidence the alleged breach of trust.

We emphasize that this is not a self-dealing case, such as is often encountered in this area of the law. Thus the trustee Bank has not sought monetary benefit from extrinsically fraudulent acts or from acts which were beyond the authority granted in the will. Here the trustee had the legal power to sell at private sale and hence the alleged breach of trust arises, according to plaintiffs, from the failure of the trustee to exercise good judgment in conducting the sale and from its failure to act fairly and to follow accepted trust practices in seeking a sale which would yield the maximum price.

### A. The Standard of Care

■ It is generally agreed that a trustee owes a duty to his beneficiaries to exercise such care and skill as a man of ordinary prudence would exercise in safeguarding and preserving his own property. This rule obtained at common law and has been codified in Colorado. The Statute, C.R.S., '63, 57–3–1 reads as follows:

"In * * * selling and managing property for the benefit of others, fiduciaries * * * shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital."

■ Thus it appears that the "reasonable prudence" standard applies to protecting and caring for the property and does not permit one to prudently speculate for example. The trustee may not subject his trust property to hazards which a man dealing with his own property might consider warranted if to

do so would create danger to the trust estate.[8]

■ We have examined the will to ascertain whether this general standard was modified by Mrs. Tammen in the broad powers of sale and disposition which are set forth in it. In the will the trustee is authorized to sell the trust property (1) in its sole judgment; (2) at private sale; (3) without advertisement or notice to anyone; (4) without the aid or necessity of any Court Order; (5) without consulting the beneficiaries and without regard to their opinions, desires or judgment; (6) and at such price and upon such terms as to credit or otherwise as the trustee shall determine.

The trustee is not authorized to exercise unlimited or absolute discretion in making a sale of trust property. Therefore, it cannot be said that it was intended that the trustee could operate beyond the bounds of prudent judgment or that he could act unreasonably.[9] But even if the instrument had contained language granting absolute and uncontrolled discretion, it would not follow that the trustee could act recklessly or in *willful* abuse of discretion.[10] In the instant case the action of the Bank in failing to test the market or to make a move toward Mr. Newhouse created not a simple risk of injury and damage to the trust, but rather in our mind a high degree of probability that the interests of the beneficiaries would be damaged.[11] Consequently even a grant of absolute discretion in the will would not have protected the Bank in this case. Nor can it be said that the grant of authority to sell at private sale increases the authority of the Bank or excuses it from exercising reasonable diligence. The same can be said of the authorization to sell without advertisement or notice. These powers assume that reasonable methods will be employed. See Webb & Knapp, Inc. v. Hanover Bank, 214 Md. 230, 133 A.2d 450, 456 (1957). Furthermore, the authorization to sell without consulting the beneficiaries does not modify the standard of care even though the trust regulates the information which the trustee must give. The trustee is not as a result of this excused from communicating information to the beneficiary which would permit him to enforce his rights under the trust or to prevent a breach of trust.[12] Finally, the authorization to determine the price at which the property will be sold does not have the effect of allowing the trustee to sell at a price less than the best price obtainable. He must use reasonable diligence and judgment in selling trust property, and cannot expose the trust to a high degree of hazard of loss.

■ There are two exculpatory clauses in Article XV of the will which the Bank contends frees it from liability. The first of these provides that the trustee shall be free from liability for "depreciation or loss" of trust property "through error of judgment." It is doubtful whether this provision applies to a loss which resulted from a sale which was not conducted in accordance with orthodox trust principles. But even if it does apply it falls short of exculpating the Bank here. Such a provision is usually held to add nothing. It does not limit the trustee liability for even negligence:

"The extent of the trustee's immunity from liability will, in large measure, depend upon the terms of the exculpatory provision. If that provision in express terms relieves the trustee from liability merely for errors of judgment, its effect does not go beyond what a court of equity

8. Wilmington Trust Company v. Coulter, 411 Del.Ch. 548, 200 A.2d 441, 448 (1964).

9. See Restatement of Trusts, Second, Section 187, Comment j (1959).

10. Carrier v. Carrier, 226 N.Y. 114, 123 N.E. 135 (1919).

11. See Restatement of Torts, Second, Section 500 together with the comments.

12. Restatement of Trusts, Second, Section 173, Comment c (1959).

would do in the absence of an exculpatory provision, for a trustee is never held to the liability of an insurer." 158 A.L.R. 276, 278.

The other clause goes further but it does not expressly apply to the misfeasance of a trustee in conducting a sale. It is found in a paragraph of the will which deals with the employment of agents and the responsibility of the trustees for their acts. It provides:

"My Executors and Trustees shall only be liable hereunder each for his own fraudulent acts. They shall be permitted to employ and compensate, out of the principal or income of the estate or trust funds, agents, bookkeepers, brokers, attorneys and assistants as deemed necessary by them for the proper administration of the estate or trust estates, as the case may be, and without liability for neglect, omission, misconduct or default of any such person so employed with reasonable care."

██ The Bank would have us broadly interpret this to apply to each and every act of the trustees. Plaintiffs argue that it should not be applied beyond the particular setting in which it appears. The intention of the decedent is not clear and the clause is not one in any event which commends itself to a court of equity whereby extensive or expansive application is invited. Our disposition is to hold that it was not intended to and does not excuse negligent conduct of a trustee in relationship to a sale.

██ There is another and independent reason why this clause does not excuse the Bank from liability here, and that is because the Bank's conduct is not simple negligence. The Bank acted as it did despite a high probability that the beneficiaries would suffer loss. Such conduct is in law reckless and is not protected by such a clause.

### B. *Loyalty of the Trustee*

██ The obligation of the trustee to exercise prudence is a species of his duty of loyalty to the beneficiaries.

He owes his allegiance to the beneficiaries first. Other considerations are secondary. The accepted standard is declared in the famous opinion of the late Mr. Justice (then Judge) Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928):

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctillio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts or equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * Only thus has. the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

██ The Bank directors—(special committee members) made the error throughout the negotiations and the consummation of the sale that ordinary business mores governed. All of their testimony at the trial proceeded on the assumption that the practical standards of business conduct which they were accustomed to observe in their various enterprises were adequate in the present fiduciary sale. This, of course, is not the law. That which appears over-all practical is not sufficient in the trust area of the law. The courts do not now and never have allowed a compromise with this fundamental principle of loyalty.

As previously noted, the Bank had somewhat of a conflict in that it owed loyalty to Miss Bonfils in connection with the F. G. Bonfils Trust and also owed loyalty to the beneficiaries of the Tammen Trust. This was a difficult dilemma. This of itself does not however appear to be the factor which caused it to favor Miss Bonfils. Nor do we be-

lieve that the Bank was overpowered by the Post management group. And it does not appear that the factor of personal friendships (of directors) was the prevailing element. It seems more likely that the personality of Miss Bonfils who has been an important and benevolent figure on the Denver scene together with reluctance to disturb the status quo explains the unreasonable Bank actions.

It is, of course, obvious that a fiduciary cannot allow personal motives to interfere with the discharge of its fiduciary duties. It cannot favor the interests of third persons and subordinate the interests of its beneficiaries as it did here and this duty is not modified by the provision of Article IV of the will which allows the trustees to enter into stockholder agreements limiting the sale of stock when such agreements would, in the sole judgment of the trustee, "promote the best interest of said company or companies and the beneficiaries in this Article named, and procure the best price for said stock in the event of the sale thereof." While this provison allowed the trustee to consider the interests of the Post, it did not empower it to disregard the interests of its beneficiaries. In any kind of balancing of interests under this clause the beneficiaries' interests must prevail.

We have considered also the several arguments of the Bank that they carefully weighed the conflicting possible solutions and at last decided that the exclusive sale to Miss Bonfils was the only prudent and expedient course to follow. Testimony of Bank officers was that the restrictive agreement was a proper precaution to take because it insured that Miss Bonfils would not sell her stock to Newhouse and thus isolate the stock in suit. We are convinced that this was not even a remote possibility—that Miss Bonfils was unalterably opposed to selling her stock and particularly to selling it to Newhouse. These officers also testified that they considered it good business policy to deal with the control group and not antagonize it

since the block of stock held by the Bank was a minority block which was subject to possible decrease in dividends or other actions. This does not bear careful scrutiny because the Bank had the only two blocks of stock available for sale and in truth the Post could not afford to antagonize it. Until the restrictive agreement was signed the Bank was in control of the situation and in a position to demand concessions. The Bank gained nothing by signing the agreement. It was entirely advantageous to Miss Bonfils and the Post group.

In summary the reasons advanced for preferring the Bonfils group are not convincing and appear to be in the nature of afterthought.

We do not say that the violation of the Bank's duty of loyalty would be of itself a sufficient reason for holding that there was a breach of trust. This evidence tends rather to show the reasons for the Bank's action, but it is the actions which point up the breach of trust.

C. *Failure to Obtain the Highest Price*

The Bank officers and the attorneys for the Bank offer a number of reasons in support of its decision not to contact Newhouse and solicit a bid from him. First they were concerned about the prospect that Miss Bonfils would have nothing to do with competitive bidding and would leave the Bank without its one sure purchaser. There is no support in the evidence for such an apprehension. Miss Bonfils had raised the original offer from $260.00 per share to $275.00 per share, however, toward the end of the negotiations she raised suddenly the price to $300.00 per share following the receipt of a letter from Sam Sherman, the lawyer for the Rippeys. An increase of approximately a half million dollars does not suggest that she might walk out. In any event it was clear to the Bank officers that Miss Bonfils was determined to prevent purchase of this crucial block of stock by Newhouse. She was not ready to give up the fight and this was apparent. A second reason for not contacting him was the possibility

that Miss Bonfils would become critically ill and thus the competition which they had created would have evaporated. But even if she had become ill this would not have lessened her interest. In fact she was at the time ill but her determination did not diminish. Finally they say that Newhouse might have made a low offer and this would have prevented Miss Bonfils from making a premium offer. This assumes that a discreet contact could not have been made. There is every reason to suppose that this could have been done. One reason which the Bank does not mention and which probably entered into the Bank's thinking and that is that they had decided to favor Miss Bonfils and on that basis it was impractical and unconscionable to contact Newhouse knowing that he had little or no chance to buy the stock. This, of course, goes back to the impropriety of making such a decision. We are of the opinion that the reasons given are after the fact rationalizatons. They are not convincing.

 The law is clear that the Trustee's duty of loyalty and of reasonable care dictate that he must seek to obtain the best price obtainable for the property which he is selling. The principle is recognized in the recent decision of the Supreme Court of Colorado in Whatley v. Wood, 157 Colo. 552, 404 P.2d 537. There a trustee gave a quit claim deed to mining property for a fraction of its value. The breach of trust was there more palpable than it is here, but the language of the Court is nonetheless apposite:

> "The rule is that a trustee has a duty to determine the fair value of trust property before selling it. And, any sale of it for an inadequate consideration measured against its fair value may be subject to being set aside as a constructive fraud upon proper complaint being made."

 How does a trustee determine value? It is entirely proper for the trustee to conduct a study for the purpose of ascertaining intrinsic worth, but the trustee must recognize the limitations of such an appraisal. He must also test the market and if he fails to do so he may be held responsible:

> "The trustees must be held to have assumed full responsibility for the fairness of the price accepted from May [the purchaser]. The evidence shows no attempt of any kind to ascertain the fair value of the stock from any source except the calculations by one of the trustees." In re Sedgwick's Will, 74 Ohio App. 444, 59 N.E.2d 616, 622 (1944).

The rule was expressed in the early English case of Harper v. Hayes, 2 Giff. (English Ch. 1860) 210 as follows:

> "In the present case no attempt was made by the defendant, Hayes, to secure competition. It has been urged, in defense of his conduct, that there were difficulties in the title that induced him most prudently not to proceed with the sale without the concurrence of all the cestuis que trust. But these difficulties afford no sufficient reason why he should not endeavor in a careful and proper way to obtain offers from persons willing to purchase the estate."

The courts of the United States have given full recognition to the duty to test the market:

> "The trustee should do his best to secure competitive bidding and to surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage." Bogert, Trusts and Trustees (2d ed. 1960) § 745.

See Dingman v. Beall, 213 Ill. 238, 72 N.E. 729 (1904); Feldman v. Feldman, 234 Md. 173, 198 A.2d 257 (1964); Stephenson v. Point Pleasant Bldg. & Loan Ass'n, 108 W.Va. 701, 152 S.E. 790 (1930).

 There may be situations in which a trustee who is authorized to sell at private sale would be justified in selling without testing the market. If, for example there exists no likelihood that any other purchaser would be

interested or the cost of a competitive sale would not be worthwhile, the trustee would not be required to go through the motions. When he knows that there is an interested purchaser he must solicit a bid from him. This rule was expressed in Neale v. Peverley, 114 Md. 198, 78 A. 1102 (1910):

"There is no reason why a private sale should not also be accorded the advantage of legitimate and seasonable competition."

As previously indicated, a grant in the trust instrument empowering the trustee to sell at private sale does not do away with his obligation to seek out and encourage competition.[13] And even when he has absolute discretion the courts require him to encourage fair competition in an effort to get the top price for trust property.[14]

When as in the present case the trustee knows of other parties who might be interested in purchasing the property, the duty to test the market is compelling. See Webb & Knapp, Inc. v. Hanover Bank, 214 Md. 230, 133 A.2d 450 (1957). There the Maryland court refused to approve a sale where the price was 25% above the appraisal. However, the trustee had failed to meet with a prospective purchaser who had indicated an interest in the property on the day prior to the consummation of the sale. In condemning the failure to obtain a bid from the other prospective purchaser the court said:

"[Bank officials] [were] informed on the 24th of Mr. Levitt's request for an appointment, and several of the officials of The Hanover Bank who were in direct charge of the sale of Belair knew of it. * * * These officials went right ahead with their plan to ask the Trust Investment Committee at its meeting on the 25th to approve the sale of Belair Farm for $1,100,000, net; and the Trustees made no effort to obtain a bid from Mr. Levitt. It is unnecessary to review

the effort of one of the Bank officers, which we find unconvincing, to justify this course of action. Making an appointment with Mr. Levitt for the day after their recommendation for the sale to Webb & Knapp was to be acted upon was at best a solemn farce, and under the circumstances then existing would seem almost certain to choke off the possibility of a higher bid from Mr. Levitt."

The effort of attorneys for the Bank to distinguish these cases on the basis that they involved land sales is not persuasive. Competition is even more important in connection with a key block of stock. An appraisal of the latter type of property is even more difficult. Hence the trustee must expend even more effort in order to determine the sale price. See Park & Tilford Import Corp. v. Nash, 166 Md. 373, 171 A. 339, 344 (1934) wherein it was said:

"If the administrator was without knowledge of the value of the trademark and goodwill, it should have made proper effort to have learned its value, and the greater the difficulty of learning its value, the greater was the effort required of the administrator. There can be no assurance of a sale being fair and just to the owners, unless the seller has some adequate knowledge of the value of the property which he is to sell."

We are aware that the duty to seek competition is but an application of the broader "prudent man" rule and that there will be variations depending on the circumstances. The Bank urges that the peculiar facts of the case at bar fully justify their decision not to seek competitive bidding. They cite a number of cases in which other courts have ruled that ordinary prudence did not require in the circumstances that the trustee test the market prior to selling to a particular favored purchaser. We have examined those cases in some depth

---

13. Neale v. Peverley, 114 Md. 198, 78 A. 1102 (1910).

14. Dombey v. Rindsfoos, 105 Ohio App. 335, 151 N.E.2d 563 (1958).

and believe that each is distinguishable. These include Braman v. Central Hanover Bank and Trust Company, 138 N.J. Eq. 165, 47 A.2d 10 (1946); In re Mill's Will, 26 Del.Ch. 203, 26 A.2d 241 (1942); Loud v. St. Louis Union Trust Company, 313 Mo. 552, 281 S.W. 744 (1925); Wilmington Trust Company v. Coulter, 41 Del.Ch. 548, 200 A.2d 441 (1964).

It is true as the Bank contends that these cases generally uphold the decision of the trustee to sell to a particular purchaser. However, the circumstances in each of these cases are quite different from the circumstances that are here presented in that in every one of them except Wilmington Trust Company v. Coulter there was not an *available* purchaser who was ignored as in the present case.

In *Braman* the trustee made a considerable effort to find an interested purchaser, but was unable to turn up an offer until finally one Westaway, an officer and controlling shareholder of the corporation, did make an offer. The trustee finally accepted what appeared to be an attractive price and the court held that under the circumstances since the trustee had canvassed possible purchasers and had found none it was reasonable for him to deal and bargain solely with the purchaser, Westaway.

*In re Mills* is also different. There the property involved was land in a small town. There was no market whatever for it and indeed no offer was received for a period of some 15 years. At last an offer was made by an agent who had been employed by the trustee and this offer was accepted. The court upheld the sale but it was apparent that the trustee had made a diligent effort to find potential purchasers and had sold the property only after these efforts had failed.

The *Loud* case involved the sale of a minority block of mining stock which was extremely speculative. After the postwar boom the trustee decided that the stock should be sold and a considerable effort was made to test the market and sell it, but again no purchaser was found. Finally an option to purchase at $300.00 per share was given to Walker Company, which Company was gathering options in an effort to gain control. Here again the stock was not marketable; there was no competition present; and the trustee dealt solely with Walker Company only after efforts to locate other competitors had failed.

The *Wilmington* case comes closer to the case at bar than any of the others which are cited by the Bank. Involved here was a controlling block of stock in a small railroad. The trust company decided to sell at least part of the stock so as to diversify trust investments. A decision was made not to actively promote a sale but to rather consider such offers of purchase as would be received. Before the sale was completed the stock acquired a special value because the railroad was a "bridge carrier" between two major railroads, the Pennsylvania and the Santa Fe. The special value stemmed from one Heineman's acquiring control of the Minneapolis and St. Louis Railway and his effort to acquire the railroad stock which was held by the trustee as a means of establishing an inner belt line that would bypass Chicago and St. Louis. It would thereby pose a threat to the Santa Fe and Pennsylvania Railroads. Notwithstanding the presence of Heineman the trustees decided to sell to the Santa Fe and Pennsylvania. The reason for this decision was that they wished to retain a minority interest of the railroad stock if it could be protected and they felt that it could best be protected by having the ownership of the remainder in the Santa Fe and Pennsylvania. The sale was at first approved by the Supreme Court of Delaware. However, Heineman had increased his bid prior to completion of the sale and the Court found a breach of trust holding that an effort should have been made by the trustees to obtain a higher price from the Santa Fe and Pennsylvania Railroads after the Heineman bid came in. Insofar as the *Wilmington* case approves of the trustees negotiating with the single purchaser its result differs from the case at bar.

But in *Wilmington* the reasons for negotiating with the Pennsylvania and Santa Fe had a sound basis, namely protection of the 30% minority interest which the trust had decided to retain. But even in that case the Delaware Court held that the trustee was bound once the higher offer came in to continue the negotiations in an effort to obtain a higher price from the railroads. Therefore, although the *Wilmington* case is an interesting parallel in many ways it is certainly not authority in support, of the action of the Bank here.

We do not think it is necessary to consider whether the Bank violated its duties to the beneficiaries in failing to reopen the negotiations once the Newhouse offer came in. We have concluded that even without this the Bank's conduct was culpable.

## II

### *Rescission or Surcharge*

The Plaintiffs have not made a clear and unequivocal election but have been content to leave the fashioning of the remedy to the court. They have stated a preference for rescission provided the court will also issue a decree voiding the action of the Post abolishing cumulative voting so as to render a resale to Mr. Newhouse feasible. The plaintiffs could have withdrawn the surcharge demand and could have thereby elected to stand on the rescission. No such election was made and hence the shape of the remedy is left to the discretion of the court. Nor have the defendants moved to compel an election. This is to be construed as a waiver of any election requirement which might exist under the law, although it is doubtful whether such an election could have been compelled. This is not a case, as we see it at least, in which a forced election would be appropriate. To force an election of remedies would have the effect of requiring plaintiffs to predict at their peril the outcome of the case including the court's decision on the issue as to whether Miss Bonfils was in law a bona fide purchaser. The compelled election doctrine is not favored

where it has this effect. See Doyle v. Hamilton Fish Corp., 234 F. 47, 51 (2d Cir. 1916) wherein the late Judge Learned Hand said:

"[A] party has an election only between existing, not supposed, rights. * * * (To hold otherwise) would be to put him, not to an election, but to a correct estimate of his right under pain of forfeiture."

In any event an election of remedies would not have been binding. If the plaintiffs had been compelled to elect and had taken rescission and if they had failed to prove their case against Miss Bonfils, they would not have been barred from asserting a right to surcharge against the Bank. Schenck v. State Line Telephone Co., 238 N.Y. 308, 144 N.E. 592, 593, 35 A.L.R. 1149 (1924). There the Court of Appeals through Judge Cardozo said:

"An election of remedies presupposes a right to elect. * * * If in truth there is but one remedy, and not a choice between two, a fruitless recourse to a remedy withheld does not bar recourse thereafter to the remedy allowed."

In accord is Bogert, Trusts and Trustees (2d ed. 1962) Sec. 945, and Holscher v. Ferry, 131 Colo. 190, 280 P.2d 655 (1955); Graybill v. Corlett, 60 Colo. 551, 154 P. 730 (1916).

Thus a forced election of remedies would not have been of benefit to either party and would only have served to make a complex case even more complex.

In selecting the appropriate remedy the controlling consideration is the award of fair compensation and advancement of the best interests of all of the beneficiaries. Restatement of Trusts, Second, Sec. 291, Comment 1. We cannot help believing that in expressing preference for rescission, plaintiffs are favoring the interests of Mr. Newhouse whose continuing desire to purchase the stock has given it a value beyond its normal market or intrinsic value. However, as we have previously pointed out, Mr. Newhouse is not directly involved in this ac-

tion. He is not a party and is not bound by the judgment. If the plaintiffs have a binding commitment to purchase from him we are not aware of it. On the other hand the remedy of surcharge provides fair compensation based on the amount which could have been in all probability obtained on June 22, 1966 had the stock been offered to Newhouse. Accordingly we conclude that it is a case for surcharge rather than rescission.

### III

#### The Status of Miss Bonfils

Miss Bonfils and The Denver Post, Inc. were named as defendants in this case only because of the claim in rescission. Plaintiffs have not demanded damages against these parties. If rescission had been granted, the Post and Miss Bonfils would have been essential to carrying out the decree which would have voided the sale and ordered return of the stock and purchase price. To grant this relief we would have had to determine that Miss Bonfils was not a bona fide purchaser. Inasmuch as we have decided that the remedy is surcharge it is not absolutely essential to decide whether Miss Bonfils was in law a bona fide purchaser. Even though it is not essential, we are of the opinion that there should be some comments on the status of Miss Bonfils for these reasons: We have pronounced freely on every aspect of the case including the conduct of Miss Bonfils and the Post management group and to fail to discuss this leaves somewhat of a void and imbalance. Furthermore, her status may become important on appeal; to determine it now could avoid a remand.

We have previously mentioned that the interest which Miss Bonfils was advancing was somewhat different from that of the Bank. She sought to purchase the stock at the lowest price possible so as to maintain her control and prevent the encroachment of Mr. Newhouse—a valid objective. Also, she did not owe a fiduciary duty as did the Bank. Counsel for Miss Bonfils have also stressed that the purchaser from a trustee who acts under a power of sale need not measure or consider the extent of the trustee's discretion; he may leave this to the trustee. The rule is accurately expounded in the Restatement of Trusts, Second, Sec. 297, Comment 1 as follows:

"If the transferee has notice of the existence of a trust and of the terms of the trust, and after using due diligence to ascertain whether the transfer is in breach of trust reasonably believes that the facts are such that the transfer is not in breach of trust, he takes free of the trust if the other requirements of bona fide purchase are complied with. If by the terms of the trust the trustee is authorized to sell trust property if in his discretion he deems it wise, the purchaser is not bound to inquire whether the trustee is properly exercising his discretion. *If, however, the purchaser knows or should know that the trustee is abusing his discretion and therefore is committing a breach of trust in making the sale, he takes subject to the trust.*"

From the above text statement which is well supported by the cases it is to be concluded that while a purchaser from one who has express authorization is usually protected, this principle is *not* without limitation. It is a question of how much knowledge the purchaser has, and this is to be measured objectively. Restatement of Trusts, Second, Sec. 297, Comment j.

Miss Bonfils did not lack notice or knowledge. Through her agents she knew everything that the Bank knew including the high probability of harm to the trust. She knowingly accepted the risk and even gave an indemnity agreement to the Bank to cover it. This persuades us that she was not a bona fide purchaser.

### IV

#### The Amount of Damages

Counsel for the Bank argue that the evidence in the case is insufficient to support an award of any amount of damage. This is based on the fact that plaintiffs have not produced expert testi-

mony showing the reasonable market value of the stock on the date of the sale. Plaintiff's damage testimony is limited to the offer of Mr. Newhouse which was received on June 23, 1966 in the amount of $500.00 per share for all of the stock embraced in the minority shareholders' agreement. This together with the Newhouse testimony that he considered bidding and was willing to pay $450.00 per share for the Tammen block alone plus an additional $50.00 per share if he could also gain an additional block sufficient to give him control constituted plaintiff's proof. It is true that this evidence is not the usual opinion type of proof which is usually offered in support of a damage claim. But proof of general market value would not be germane in circumstances of competition like those presented here. It was the intense interest of Miss Bonfils and of Mr. Newhouse which gave the stock peculiar value. This circumstantial evidence is more pertinent than the unrealistic intrinsic value evidence which was offered on behalf of the Bank. This at best reflected general market value. These appraisals failed to give any substantial effect to the competition factor and therefore its probative value is limited to providing a benchmark of value.

██ If there is uncertainty as to the extent of damage to the trust, there can be no doubt as to the fact of damage. In such a case, the Colorado decisions hold that damages are to be closely approximated by drawing reasonable and probable inferences from the facts proven. United States National Bank v. Bartges, 120 Colo. 317, 210 P.2d 600 (1949); Westesen v. Olathe State Bank, 75 Colo. 340, 225 P. 837 (1924).

██ We hold that the evidence of the willingness of Mr. Newhouse to pay $450.00 per share for the Tammen block of stock alone is competent and relevant to demonstrate the loss suffered as a result of the Bank's breach of trust. The decisions recognize use of this method and this type of inferential approach in circumstances like the present. Cf. DuBois v. Bowles, 30 Colo. 44, 69 P. 1067

(1902); Webb & Knapp v. Hanover Bank, 214 Md. 230, 133 A.2d 450 (1957); In re Sedgwick's Will, 74 Ohio App. 444, 59 N.E.2d 616 (1944).

██ The Bank argues that it should not be surcharged in the amount of the Newhouse offers because it was not able to foresee that he would be willing to pay that much. We believe, however, that the Tort analogy which holds the wrongdoer liable for unforeseeable damages where injury can be foreseen applies. The "prudent man" rule of trust law is quite similar to its counterpart in the law of negligence and hence the analogy holds. It would be highly unjust to allow damages to be measured by actual foreseeability of the amount once culpability is established.

Plaintiffs argue that the amount of the surcharge ought to be with reference to $500.00 per share since Newhouse also indicated conditional willingness to pay that sum. We believe, however, that the $450.00 amount and the $150.00 per share surcharge finds more solid support in the evidence.

We conclude that the preponderance of the evidence supports a surcharge in the amount of $150.00 per share or a total of $2,655,697.30 together with interest to the extent that the law recognizes and allows it.

### V

### The Judgment and Decree

We have fixed the amount of damages which the plaintiffs are entitled to recover on behalf of the trust. The amount is $2,655,697.30. Plaintiffs are entitled to judgment against the Bank in this amount.

Since plaintiffs have not demanded monetary damages against Miss Bonfils and since we have determined that rescission should not be granted, the claim against the Post and Miss Bonfils should be and is hereby dismissed.

The question of removal of the Bank as trustee has not been argued and is not now decided. Further hearing will be granted on this if it is desired.

A further hearing is necessary in order to settle costs and related matters. A conference on this subject will be set in the near future.

Counsel will prepare a form of judgment for the signature of the Court.

We wish to commend and thank counsel on all sides of the case for an extraordinarily fine effort in both preparation and presentation.

## Appendix to Opinion

### Recapitulation of the More Important Findings in the Case

1. In May 1966 there were two blocks of Denver Post stock which were potentially available for purchase. One of these was the Tammen stock here in suit. The other was that owned by the F. G. Bonfils Trust and held by the defendant Bank and the First National Bank of Kansas City as co-trustee. Acquisition of both blocks by Mr. Newhouse would have given him voting control of the Denver Post, Inc. Miss Bonfils and the Post management group sought to prevent Mr. Newhouse from purchasing the Tammen stock so as to effectively eliminate the possibility of his gaining control.

2. During the tenure in office at The Denver Post of Mr. E. Ray Campbell, the control of Helen Bonfils was effective and there was no particular need to acquire the Tammen block of stock since Campbell was committed to retention of it. Once, however, Campbell decided to retire as an officer of the Post and also as trustee of the Tammen Trust, a threat existed to the Bonfils-Post management group control. A sale of this stock by the successor trustee was at once appropriate, necessary and likely to occur. Newhouse was a logical purchaser who posed a threat to the Bonfils control if he could gain both this block and that held by the F. G. Bonfils Trust.

3. The succession by the Bank as trustee of the Tammen Trust created somewhat of a conflict for it because as of that time the Bank was a co-trustee of the F. G. Bonfils Trust with the First National Bank of Kansas City. The Bank knew from past experience that the Kansas City bank was disposed to go along with the interests of Miss Bonfils and that it would probably not consent to a sale of that stock. Thus, by accepting the Tammen Trust the Bank was in the position of having to retain one block of stock and at the same time having to sell the Tammen stock. They, nevertheless, accepted the Tammen trust at the same time deciding to sell the Tammen stock at once. The Tammen stock would command a premium price to Newhouse because it could lead to a forced sale of the F. G. Bonfils stock at a premium also. But sale to Miss Bonfils of the Tammen stock threatened to isolate the Bonfils Stock as a minority block and depreciate its value.

4. As of May 19, 1966, the Post-Bonfils group had decided that as a matter of necessity, it had to purchase the Tammen block of stock. Therefore, before the Bank had succeeded to trust, the Post-Bonfils representatives informed the Bank of its wish to purchase and even then made an offer.

5. A few days after it became trustee of the Tammen Trust the Bank decided to sell to the Post or Miss Bonfils to the exclusion of Newhouse, notwithstanding that Miss Bonfils and Newhouse were the only possible purchasers. It decided not to contact Newhouse and it did not do so. The minority shareholders' agreement of June 7, 1966, carried out this decision. This agreement effectively committed the Bank to sell to Miss Bonfils and to no one else for a period of one year. The Bank failed to disclose the existence of this agreement to the beneficiaries until June 15 and 16. It should have disclosed this on June 7.

6. The Bank in its discussions with Mr. Sherman and the Rippeys led them to believe that the sale would not be carried out until the Bank price study had been completed. The indications were that this would not occur until about 30 days after June 15, 1966.

7. The transaction was concluded with undue haste and without notice to the Rippeys of the change. Once the Bank agreed to a price, on or about June 20,

1966, the sale was consummated at once. This prevented the making of any offer by Newhouse. Moreover the preemptive offer by Newhouse did not cause the Bank to seek to hold the transaction in abeyance or to maintain the status quo.

8. Once it appeared that there was to be litigation, the Bank assumed a partisan position toward the beneficiaries exercising all the punitive powers vested in it by the will. It cut off the income to the Rippeys without a Court Order. It then filed an action in Probate Court seeking to obtain approval of what it had done. This self-help effort evidenced a hostile attitude toward the beneficiaries —an attitude showing an intent to force submission to the Bank's decision and action.

9. The indemnity agreement given by Miss Bonfils to the Bank in connection with the sale and the acceptance of this agreement as part of the sale evidenced knowledge on the part of the Bank that there existed a hazard of breach of trust whereby it might be sued. The Bank officers testified that this was offered to them and thus they accepted it, although they did not think it was necessary. Nevertheless, the execution of this agreement effectively disclosed that both the Bank and the Post group were aware that a breach of trust might be asserted by the Rippeys.

10. The sale was authorized by the trust instrument pursuant to broad powers granted to sell at private sale. The price obtained was fair in relationship to the actual value. However, had the Bank offered to sell to Newhouse a sale could have been made at a much higher price. While at the time of the sale neither the Bank nor the Post was actually aware that Newhouse would pay a preemptive price they were fully aware that he was a potential purchaser and they knew that if the stocks were offered that he would probably pay more or that a bidding contest would result.

11. The Trust suffered injury and loss as a result of the sale to Miss Bonfils and the adamant refusal of the Bank to offer the stock to Mr. Newhouse.