In re Trusteeship of Trust Created by Will of Sedgwick.

(No. 790—Decided November 4, 1944.)

*Messrs. Heinlein, James & Jones* and *Mr. K. G. Cooper,* for appellants, trustees.

*Mr. Gordon D. Kinder* and *Mr. W. G. Frazier, Jr.,* for appellees.

Ross, P. J. An appeal on questions of law and fact was filed by the appellant trustees to a judgment of the Probate Court of Belmont county, sustaining three out of sixteen exceptions filed by the beneficiaries of a trust created by the will of Ira B. Sedgwick.

Under date of March 4, 1944, there appears in the docket entries: "Cause heard on exceptions to accounts exceptions sustained in part, overruled in part."

There is nothing presented to indicate that at that time any action of the court was "filed for journalization."

Motion for a new trial was filed March 6, 1944.

The final judgment of the court was journalized April 29, 1944. In such journal entry, motion for a new trial was overruled.

The filing of exceptions in the Probate Court to an account of a trustee does not constitute a chancery case. *Squire, Supt. of Banks,* v. *Bates,* 132 Ohio St., 161, 5 N. E. (2d), 690.

An appeal on questions of "law and fact" to the Court of Appeals from a judgment of the Probate Court upon such exceptions will be dismissed *sua sponte* by the Court of Appeals for lack of jurisdiction. *Squire, Supt. of Banks,* v. *Bates, supra;* Section 6, Article IV, Ohio Constitution.

Such appeal on questions of "law and fact," however, includes an appeal on questions of law from such judgment and the case in Court of Appeals will be heard upon such latter appeal. Section 6, Article IV, Ohio Constitution. Section 12223-22, General Code; *Nordin* v. *Coulton,* 142 Ohio St., 277, 279, 51 N. E. (2d), 717.

This appeal will be, therefore, considered as an appeal on questions of law.

As the appellants rely strongly upon a claim that the judgment of the trial court is against the weight of the evidence, it becomes at the outset necessary to determine whether the appellants have taken the necessary procedural steps to present such assignment of error to this court.

Where an appellant from a judgment of the Probate Court sustaining exceptions to an account of trustees seeks to attack such judgment because the same is not sustained by the weight of the evidence, it is necessary that a motion for a new trial should have been filed, after a decision of the court, disposing of all the

controlling issues in the case, had been ''filed for journalization'' in such Probate Court.

The notation that a decision was made on the trial docket does not constitute a filing for journalization. *Krasny* v. *Metropolitan Life Ins. Co.,* 143 Ohio St., 284, 54 N. E. (2d), 952.

When the motion for a new trial was filed in the instant proceeding, no action of the court disposing of the controlling issues presented to it had been ''filed for journalization'' and no such entry appeared thereafter until the final judgment of the court. No motion for new trial was filed thereafter. The judgment of the court was unquestionably predicated upon the weighing of conflicting evidence upon· the issues presented. No motion for a new trial effective to present the weight of the evidence as an assignment of error in this court was duly filed. *State, ex rel. Curran,* v. *Brookes, Jr.,* 142 Ohio St., 107; *Eagle Savings & Loan Co.* v. *Hucke,* 73 Ohio App., 1, 53 N. E. (2d), 537. The weight of the evidence will, therefore, not be considered by this court as an assignment of error, in its consideration of the appeal on questions of law.

What, therefore, remains?

It is also the claim of the appellants that the judgment of the Probate Court is not sustained by any evidence justifying the allowance of the three exceptions to the account of the trustees.

Whether there is any substantial evidence to support the judgment of the Probate Court, sustaining the exceptions to the account of the trustees, is a question of law, and the filing of a motion for a new trial is not necessary to present such question as an assignment of error to the Court of Appeals. *Travelers' Indemnity Co.* v. *M. Werk Co.,* 33 Ohio App., 358, 169 N. E., 584; *Glen* v. *Aetna Life Ins. Co.,* 73 Ohio App., 452.

The rule involved is similar to that presented where

a trial court takes the case from the jury and enters judgment upon the theory that there is no evidence to sustain a claim or defense. In such case, the question presented is one of law and does not require or permit a weighing of the evidence or filing of motion for a new trial. *Maynard* v. *B. F. Goodrich Co.,* 144 Ohio St., 22.

Therefore, in order to disturb the judgment of the Probate Court in the instant case, it is necessary for this court to find, as a matter of law, that there is no substantial evidence in the record sustaining the judgment of the Probate Court. *Bishop* v. *East Ohio Gas Co.,* 143 Ohio St., 541; *Webb* v. *Champion Coated Paper Co.,* 68 Ohio App., 546, 31 N. E. (2d), 96.

These conclusions define the position of this court in approaching a consideration of the evidence and law involved in this appeal upon questions of law. Disposition has been made thereof at this time, for the reason that, in stating the facts and issues presented, the scope of investigation by this court is more limited than would otherwise be the case.

The three exceptions to the fifth account, filed by the beneficiaries of the trust under the will of Ira B. Sedgwick, sustained by the trial court are as follows:

"1. The said trustees, by collusion with one W. R. May, on or about the 2d. day of January, 1937, transferred ninety-three shares of the stock of The Sedgwick Printing Company, which was held by them in trust under said will for the exceptors, and received therefor approximately one-third of the true value thereof, and said trustees being officers and directors of said corporation and said May being a director of said corporation, and all having the means of knowing and knowing the true value of said stock, and said stock was transferred by the said trustees without consulting the exceptors, or any one of them and without

giving notice to exceptors, or any one of them, that said sale was contemplated, or under consideration, without advising exceptors, or any one of them, of their legal rights, or making exceptors, or any one of them, aware of the material facts and without giving exceptors, or any one of exceptors an opportunity to purchase the same, or secure a buyer for the same, at the true value thereof.

"Said trustees do not in said account and did not in any account by them previously filed, charge themselves with the difference between what they received for said ninety-three shares of stock, to wit, twenty-one thousand two hundred and four dollars, and the true value thereof at the time of its transfer, which was approximately sixty thousand dollars ($60,000). * * *

"3. The trustees in said account show that they hold the sum of twenty-five thousand five hundred and three dollars and twenty-six cents ($25,503.26), in what they designate as an income account and which represents income from said trust estate which should have been distributed to the exceptor Emily Sedgwick and which is her property, and, which, with interest, should be ordered distributed to said exceptor. * * *

"8. The exceptors except to the charge of $1,000 set up in said account against said trust for ordinary services rendered during the period covered by said fifth account and object to the allowance of the same for the reason that the trustees are entitled to no compensation in addition to what they have already received and are indebted to said trust for compensation which they have had allowed them by the court without divulging what they received as officers of The Sedgwick Printing Company and The Daily Times Company."

Ira B. Sedgwick died testate July 20, 1920. By the terms of item III of his will, Alvin L. Sedgwick and

Chester C. Sedgwick, his brothers, were named trustees of certain property. Emily R. Sedgwick, widow of testator, and her children were the beneficiaries of the trust.

Item III of the will is as follows:

"Item III. I give, bequeath and devise to my brothers, A. L. Sedgwick and C. C. Sedgwick, in trust, the total number of shares of the capital stock of The Sedgwick Printing Company, a corporation, which I may own or have the right to dispose of at my demise; also all my right, title and interest in and to lot No. 55, at the corner of South Fourth and Hickory streets, in the city of Martins Ferry, Belmont county, Ohio, and being the real estate used and occupied in part by said company; to be held, used and employed by my said trustees upon the trust and for the following purposes, to wit:

"1. I give, bequeath and devise to my said wife, Emily R. Sedgwick, if living, and after her death equally to my children then living, the entire net income or proceeds from said stock and real estate.

"2. I direct that my said trustees shall pay to my said wife or to my children, as above provided, during the continuance of said trust, not less than seventy-five dollars ($75) per month, on the first day of each calendar month, as a part of said income or proceeds, and I hereby make the payment of said sums a charge upon my right, title, and interest in said real estate.

"3. If, after the death of my said wife and at the time my youngest child then living shall arrive at lawful age, any of said stock or real estate remain in the possession of my said trustees, I direct my said trustees to transfer and convey the same to my said children in equal shares.

"4. I hereby empower and authorize my said trustees fully and completely to sell, convey, transfer, as-

sign, mortgage, lease, rent, pledge, hypothecate, invest and reinvest the whole or any part of said stock or real estate, in such manner and form, upon such terms and conditions, and at such times, as to my said trustees may seem advisable, including the right to terminate this trust at any time by the exercise of the said powers and authority.''

The corpus of the trust estate consisted of 93 shares of the common stock of The Sedgwick Printing Company and certain real estate. In a reorganization of the company, in 1923, the common stock was changed from $50 par value to no par stock and two shares no par issued for each par share, thus changing the holding in the trust estate to 186 shares of non par common stock.

The real estate consisted of an undivided one-half interest in the land upon which the company's business was located.

In the reorganization of the company, provision was made for the issue of 300 shares of 8% preferred stock of the total par value of $30,000. One-half of such preferred stock was issued to the trustees in exchange for the conveyance of the undivided one-half interest in the real estate.

The holdings of common stock in the company were then in 1923: 186 shares in the trustees; 188 shares in Alvin L. Sedgwick, individually; 20 shares in Chester C. Sedgwick, individually; 2 shares in Sadie Sedgwick; 2 shares in F. K. Dixon; and 2 shares in Emily R. Sedgwick, a total of 400 shares of common stock.

In 1935, F. K. Dixon transferred his 2 shares of common stock to W. R. May, general manager and director of the company.

Such holdings remained in this ratio until January 1937, when the trustees sold 93 shares of the no par common stock of the company to W. R. May, leaving

93 shares no par common stock still in the trust estate. May paid $228, ex-dividend, per share for the trust stock. A dividend declared shortly before made the price of such stock with dividend $303. No cash was paid by May for the trust stock. His note bearing 6% interest, payable ''on or before the death of Emily R. Sedgwick'' was accepted by the trustees in payment for the stock. The stock so sold was pledged by May with the trustees as the only collateral to secure the payment of the note. This note was paid in December 1939, at the time of the sale to Dix and others. In that period $3,817.32 was paid to the trustees as interest on the note of May. The 93 shares of the common stock of the company transferred to May by the trustees and held as collateral earned for May dividends in the same period of $7,533. The stock was sold to May for $228 per share, and by him in December 1939, for $512.50 per share.

Approximately at the same time, Alvin L. Sedgwick sold to Chester C. Sedgwick 73 shares of his holdings of no par common stock at the same price as that of the stock sold by the trustees to May, to wit: $228; thus increasing the holding of Chester C. Sedgwick from 20 shares to 93 shares, and decreasing the holding of Alvin L. Sedgwick from 188 shares to 115 shares.

On December 29, 1939, the entire common stock of the company was sold to A. V. Dix and his associates for the sum of $205,000, at the rate of $512.50 per share. The entire issue of preferred stock had shortly before been retired by payment in full of the par value thereof. An agreement by the trustees not to enter into the newspaper business was a part of the consideration.

There is nothing in the record to indicate that the trustees at the time of the sale of the trust stock to

May, in January 1937, had any reason to anticipate that in December 1939, a purchaser for the entire stock would appear and pay $512.50 per share therefor. On the other hand, there is substantial evidence to indicate that the stock sold to May in 1937 was, at that time, worth the sum paid for it by Dix in December 1939, that is, $512.50 per share. This evidence is in direct conflict with other evidence of the trustees indicating the price paid by May was a fair price, but this court under the state of the record is bound to accept the evidence of the higher value, there being no showing that it is not entitled to credence. In any event, this court is bound to accept under the circumstances the estimate of the trial court as to the credence to be given such evidence. The court found that the true value of the stock at the time it was sold to May by the trustees was $500 per share and allowed a recovery of the difference between the value of the stock at $228 per share and $500 per share. This appears from mathematical calculation of the figures set out in the judgment entry of the court:

"It is therefore considered that the said Alvin L. Sedgwick and Chester C. Sedgwick be and they are hereby charged with the difference between the twenty-one thousand two hundred four ($21,204) dollars they received from W. R. May for the ninety-three shares of stock of The Sedgwick Printing Company belonging to and the property of said trust sold by them as trustees to the said W. R. May on or about the first day of January, 1937 and forty six thousand, five hundred ($46,500) dollars which the court finds was the true value of said stock at said time and which difference the court finds to be twenty five thousand two hundred and ninety six ($25,296) dollars * * *."

May, at the time he purchased the stock, was a director and general manager of the company. He was

a nephew by marriage of the trustees. He first came to the company in 1923. He left and went to Cleveland, where he did well. He accepted an invitation to return to the company as its general manager in 1925, with the understanding he would be permitted to purchase stock in the company. In 1934, competition with the publications of the company became acute, and May, by resourceful measures, was able to preserve the successful status of the company as an advertising medium in the territory in which it operated. He made demands for stock during 1934 and the succeeding years. In 1936, the trustees, after making a computation of the value of the stock, offered it to May at a price of $228 per share, ex-dividend, or $303 per share if a contemplated dividend of $75 per share followed the stock. May elected to accept the stock at $228 per share, ex-dividend.

There can be no question that May was a valuable man and had he left the company his loss would have been severely felt. There also seems to be no question that if he had not been permitted to purchase the stock he would have severed his connections with the company. This is strenuously denied by the trustees. The sale of the trust stock was, therefore, a direct benefit to the beneficiaries, to Alvin and Chester Sedgwick, and to May, and it was also apparent that the benefit to all of those was a motivating influence in causing the trustees to sell the trust stock.

None of the beneficiaries were consulted as to the advisability of the sale. The contemplated disposal of the trust stock was not communicated to the court, or its approval sought. The sale to May occurred on January 2, 1937. The first time anything appeared to put the beneficiaries on notice of this sale was when the third account of the trustees was filed November 15, 1938, in which appeared notations of receipts of

interest from W. R. May, at various periods, and the following item under "Statement of Funds:"

"W. R. May

"Martins Ferry, Ohio, 1/2/37—Note 93 shares S. P. Co. demand 21204 6% ........... $8137.50."

Apparently, this change in the status of assets was overlooked, for it was not until the filing of the fourth account on November 27, 1940, that any action was taken by the beneficiaries. Exceptions were then filed and later the beneficiaries were induced to withdraw the same.

It is asserted by the appellants that the rule of *res judicata* is applicable and bars the beneficiaries from again asserting exceptions which were previously filed and disposed of as indicated. No authority requires such a conclusion, but authority appears to the contrary. *In re Estate of Russell,* 60 Ohio App., 385, 21 N. E. (2d), 604; *Crawford, Admr.,* v. *Zeigler,* 84 Ohio St., 224, 231, 95 N. E., 743.

In connection with the charge of concealment made by the beneficiaries, it appears that shortly before the sale of all the stock to Dix, and others, in December 1939, Ernest R. Hoge met Chester C. Sedgwick in the presence of Emily and her son James. Hoge asked Chester if the ratio of the trust stock remained the same as it was at the time of the death of Ira, the testator, and Chester replied that it had. Obviously, such was not the case, in view of the sale to May and the sale of Alvin to Chester in 1937. This evidence presents certainly an inference that the trustees desired secrecy to surround the May and Chester sales and only, as in the case of the notations in the account, permitted the most meager suggestion of the transaction to be known.

The trustees must be held to have assumed full responsibility for the fairness of the price accepted from

May. The evidence shows no attempt of any kind to ascertain the fair value of the stock from any source except the calculations by one of the trustees.

There is substantial evidence, and the trial court evidently so found, that the situation of the company was not materially different in December 1939, from what it was in January 1937. The fortuitous circumstance of the purchase of the stock by Dix and others in 1939 cannot be taken as a *controlling* circumstance in fixing the value of the stock in 1937, but it is a circumstance to be considered with other evidence, in determining the value of the stock in 1937, it being made to appear that no substantial change had occurred internally or externally in the status of the company between the dates involved. The trial court committed no prejudicial error in permitting the evidence of such later value, in view of the stability of all circumstances involving the company. This, in no way, affects the duty of this court to consider only the obligations resting upon the trustees at the time of the sale to May in January 1937.

The question presented is: Should they in all good conscience, looking only to the interest of the trust and the beneficiaries, permitting the interest of no other person to sway them, acting as reasonable men in the control of their own affairs, using any special skill or knowledge they possessed, have accepted $228 per share as the fair value for the trust stock?

It is claimed by the trustees that the fairness of the sale price of the trust stock is shown in that Alvin accepted the same price at the same time in 1937 as that paid by May. But Chester, a co-trustee, paid only such price, and gave his note bearing no interest, payable upon the death of Alvin, the stock being pledged as collateral; but Alvin was to have control and receive all dividends until the note was paid.

The value of this evidence in favor of the trustees is at least questionable.

There is evidence that Emily constantly pressed the trustees for more income and that she told them at one time to sell the "whole works."

The trustees have withheld from time to time income of the trust estate, so that at the time of the trial in the Probate Court there had accumulated in the "income account" of the trust $25,503.26. It is stated that it did not seem for the best interest of Emily to transfer this sum to her, but that it seemed better to pay her from time to time such sums as appeared required by her needs and to conserve the balance pending more severe demands, which might result from advanced age. It is sufficient to say that neither the terms of the trust nor the law justify the impounding of income.

Where a trust is created to pay the income to a beneficiary for a designated period, the trustee is under a duty to the beneficiary to pay to him at reasonable intervals the net income of the trust property. Restatement of Trusts, 467, Section 182; *Davidson* v. *Miners & Mechanics Savings & Trust Co., Exr.,* 129 Ohio St., 418, 429, 195 N. E., 845, 98 A. L. R., 1318. *A fortiori,* where the express terms of the will indicate that income is to be paid promptly, the trustees have no alternative.

Reference to the terms of the will shows an intention on the part of the testator, clearly stated, requiring such immediate payment of net income. Item III, section 1, contains a specific bequest to the beneficiaries of "the entire net income or proceeds" of the entire trust property. The language of section 2 does not modify or limit this mandate in providing the trustees shall pay to the beneficiaries "not less than seventy-five dollars ($75) per month, on the first day of

each calendar month as a part of said income or proceeds.'' That immediate payment of net accumulated income may possibly cause impairment of the corpus by the application of the latter instruction may not be taken as a reason for failing to comply with the explicit terms of the trust. It must be presumed that the testator took such a contingency into consideration. The trial court committeed no error, prejudicial to appellants, in its decree on this point.

The trial court made the following order relative to the payment of net income to the beneficiaries:

''It is further considered that the said Alvin L. Sedgwick and Chester C. Sedgwick be and they hereby are ordered to deliver to the exceptor Emily H. Sedgwick all securities and monies set out in their fifth account under the designation ''income account'' and there shown to be of the value of twenty-five thousand, five hundred and three dollars and twenty-six cents ($25,503.26), less such premiums, fees, taxes and other charges as were occasioned by and arose from the purchase of *such* bonds by them as trustees as are set out in said income account.'' (Italics added.)

If the net income should have been paid the beneficiaries from time to time, it is difficult to see how the expense incident to the acquisition of bonds would be a just charge against such income. However, the beneficiaries, appellees, have not appealed from this order which certainly did not constitute error, prejudicial to the appellant trustees, and it cannot, therefore, be disturbed. 2 Ohio Jurisprudence, 770, Section 673. In other words, while the trial court was correct in ordering immediate payment of income to the beneficiaries and such order was adverse to the interest of the trustees, permitting them to charge for premiums and expenses incident to the purchase of bonds for the income account, was not adverse to their in-

terests. Hence, this part of the judgment may not be disturbed in the absence of appeal by the beneficiaries.

Reference to the decisions of the courts of Ohio and other states indicates a growing tendency to require the utmost probity in the administration of trust estates. The settlor leaves to the trustees the interest of his beneficiaries. They may accept or reject the burden of protecting these interests. If they do accept, they take upon themselves a rigorous task. It has been suggested that too strict rules applied to the actions of trustees will discourage the acceptance of such tasks. *Willis, Admr.,* v. *Braucher, Gdn.,* 79 Ohio St., 290, 303, 87 N. E., 185, 44 L. R. A. (N. S.), 873.

Does wisdom suggest that the high type of conduct now demanded should be modified so that those unwilling to be governed by such rigorous requirements may be employed as trustees?

The later decisions of our courts indicate that the rules governing the administration of trust property have become more and more rigid in favor of beneficiaries.

The settlor, especially if he be a testator, is entirely dependent upon a high sense of honor in his trustees. To them he leaves the task he can no longer perform. Is their good intent alone sufficient to justify calamitous consequences to the interest of beneficiaries which good judgment and care could have avoided? The rules applied by the courts in examining the management of trust estates by trustees indicate that good intent is not sufficient.

The nature and extent of the duties and powers of a trustee are determined by the terms of the trust instrument, subject to limitations and requirements hereinafter mentioned. Restatement of Trusts, 403, Section 164; *Morris* v. *Mull,* 110 Ohio St., 623, 634, 635,

144 N. E., 436, 39 A. L. R., 323; *Willis, Admr.,* v. *Braucher, Gdn., supra.*

The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary. Restatement of Trusts, 431, Section 170; *Moeller* v. *Poland et al., Exrs.,* 80 Ohio St., 418, 89 N. E., 100.

The trustee is under a duty to the beneficiary in administering the trust not to be guided by the interest of any third person. Restatement of Trusts, 440, comment, p.

The relation between the trustee and the beneficiary being a fiduciary relation, the standard of conduct required of the trustee is higher than that required of persons who are not in a fiduciary relation. Restatement of Trusts, 441, comment u; *In re Estate of Binder,* 137 Ohio St., 26, 47, 27 N. E. (2d), 939.

The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property and if the trustee has greater skill than a man of ordinary prudence, he is under a duty to exercise such skill as he has. Restatement of Trusts, 448, Section 174.

If there is more than one trustee, each trustee is under a duty to the beneficiaries to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of trust. Restatement of Trusts, 468, Section 184.

The beneficiary has a right to receive promptly any information which will guide him in determining whether his interests have been properly served by the trustees. Restatement of Trusts, 447, Section 173, and comment C; *Ohio Merchants Trust Co., Admr.,* v. *Conrad,* 42 Ohio App., 150, 181 N. E., 274; *Beck* v. *Fishel,* 16 C. C. (N. S.), 130, 26 C. D., 616.

462

Such are the rules governing trustees in the administration of the trust and in their relation to the beneficiaries.

By these rules is the evidence in this case tested. They are hard and severe rules. But the duty is of high degree and the opportunity for injury great.

In reaching the conclusion that there was substantial evidence sustaining the judgment of the trial court upon all three of the exceptions, and that no error, prejudicial to the rights of the appellants, intervened in the trial, in view of the evidence and the law noted, the relative situation of the trustees and beneficiaries when the ultimate realization upon their holdings occurred is considered. Alvin received $512.50 per share on 115 shares; Chester $514.50 upon 93 shares; and May $512.50 upon the 93 shares sold to him by the trustees. The beneficiaries alone suffered by the previous sale to May. Nothing has been shown indicating that the judgment of the Probate Court upon the question of trustees' compensation was not sustained by substantial evidence.

The judgment of the Probate Court of Belmont county is affirmed.

*Judgment affirmed.*

Ross, P. J., and Matthews, J., concur in syllabus, opinion and judgment.

Hildebrant, J., concurs in syllabus.

Ross, P. J., Hildebrant and Matthews, JJ., of the First Appellate District, sitting by designation in the Seventh Appellate District.