*In re* ESTATE OF GEORGE S. HALAS, JR., Deceased (A. Gerson Miller, Ex'r of the Estate of George S. Halas, Jr., Deceased, Petitioner-Appellant and Cross-Appellee, v. Virginia McCaskey *et al.*, as Co-Ex'rs of the Estate of George S. Halas, Sr., Deceased, Respondents-Appellees and Cross-Appellants (The Chicago Bears Football Club, Inc., *et al.*, Respondents)).

First District (3rd Division) No. 1—89—0645

Opinion filed January 23, 1991.

Marshall E. Eisenberg and Stephen Fedo, both of Neal, Gerber & Eisenberg, of Chicago, for appellant.

Joseph R. Lundy and Thomas W. Abendroth, both of Schiff, Hardin & Waite, of Chicago, for appellee Virginia McCaskey.

Daniel M. Schuyler, of Schuyler, Roche & Zwirner, of Chicago, for appellee Michael Notaro.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

This appeal arises from an action brought by the petitioner, A. Gerson Miller, in his capacity as the successor executor of the estate of George Halas, Jr., against the estate of the former executor, George Halas, Sr., alleging that George Halas, Sr., breached his fiduciary duties while acting as executor of his son's estate and trustee of two testamentary trusts, the beneficiaries of which are the children of George Halas, Jr. The petitioner's complaint alleged that George Halas, Sr., breached his fiduciary duties by failing to give notice to, and by failing to protect the interests of, the beneficiaries during a corporate reorganization of the Chicago Bears Football Club, Inc. (hereafter Chicago Bears or Bears). The petitioner sought alternative forms of declaratory and injunctive relief which were later rendered moot by the sale of the children's beneficial interest in the Chicago Bears during the trial below. The petitioner's remaining prayer for re-

lief that the estate of George Halas, Sr., be surcharged for damages and attorney fees and costs is now before us as the petitioner appeals from the trial court's award of $1 in nominal damages. The respondents, Virginia McCaskey and Michael Notaro, in their capacity as co-executors of the estate of George Halas, Sr., cross-appeal from the trial court's judgment finding that George Halas, Sr., breached his fiduciary duties.

George Halas, Sr., was the founder of the Chicago Bears and the club's president until his death on October 31, 1983. The Chicago Bears was originally incorporated as an Illinois corporation on April 1, 1922. George Halas, Sr.'s children, George Halas, Jr., and Virginia McCaskey, acquired stock in the team through prior gifts and sales. George Halas, Jr., also assisted his father in managing the team until his death on December 16, 1979. At the time of his son's death, George Halas, Sr., was 82 years old and owned 76.5 shares representing a 49.35% interest in the Bears. The estate of George Halas, Jr., owned 30.5 shares representing a 19.68% interest in the Bears. The remaining outstanding shares were owned by Virginia McCaskey, James E. Finks, Charles A. Brizzolara, Robert and Carol Brizzolara in joint tenancy, and Nancy B. Lorenz.

In his will, George Halas, Jr., directed that his 30.5 shares be held in separate trusts for the benefit of his children, Stephen and Christine. In addition to naming his father executor of his estate, George Halas, Jr., also appointed his father trustee of his children's trusts. Under article five, George Halas, Jr., expressly authorized his trustee to invest in and retain indefinitely the Bears stock and absolved the trustee of any liability for any diminution in value of the Bears stock resulting from the making or retaining of investments in the Chicago Bears. George Halas, Jr., further authorized his trustee "[t]o have with respect to trust property all the rights of an individual owner, including the power to give proxies, to participate in voting trusts, mergers, consolidations, foreclosures, *reorganizations* or liquidations, and to sell stock subscription or conversion rights." (Emphasis added.) Under article eight, the executor and trustee are authorized "to elect himself or herself as a member of the Board of Directors of [the Chicago Bears] *** and to deal in an individual capacity or as a director or officer of said corporation with himself or herself as an executor hereof or a trustee hereunder." Article eight also states that the executor and trustee may take any such action without court approval and "subject to his or her duty to act fairly, his or her actions in these respects shall be as binding and conclusive upon all of the beneficia-

ries hereunder *as though no such relationship or possible conflict of interest existed.*" (Emphasis added.)

On July 20, 1980, Thomas Chuhak was appointed guardian *ad litem* to represent Stephen and Christine Halas. On October 13, 1981, Mr. Chuhak obtained a court order which the parties refer to as the "Chuhak order." That order mandated that the executor of the estate give Chuhak "30 days advance notice in writing in the event the Executor decides to sell, convey, mortgage, encumber, hypothecate or effect a redemption of any of the shares of stock issued by the Chicago Bears Club, Inc., that have been, or are hereafter, inventoried by the Executor of this Estate."

On July 15, 1981, a special meeting of the shareholders was held during which a proposal to reorganize the Bears was discussed. Present were the shareholders and Edward McCaskey in his capacity as vice-president, Jerome Vainisi, who was the treasurer and assistant secretary, Mr. John M. Brenmer from the accounting firm of Ernst & Whinney, and counsel from the law firm of Kirkland and Ellis. The proposal called for the execution of stock exchange agreements and a merger with a newly formed Delaware corporation that would be structured to achieve various objectives for the shareholders. The purpose of the reorganization was to: (1) "freeze" the value of stock owned by Halas, Sr., and shift future appreciation to the grandchildren in order to save estate taxes; (2) maintain control of the Bears in the family; and (3) reduce income taxes on rental income derived from skyboxes that were to be built at the stadium. After the proposed reorganization was explained, the shareholders were provided with copies of the proposed stock exchange agreement and the articles of incorporation for the new corporation. A vote on the matter was tabled so that the shareholders could consult with private counsel.

On October 20, 1981, the shareholders signed a pre-organization subscription agreement providing for the exchange of their shares in the Illinois corporation for shares in a soon-to-be-formed Delaware corporation. The Chicago Bears Football Club was incorporated in Delaware the following day, and the directors of the Illinois corporation approved the subscription agreement and the stock exchange agreement. On December 7, 1981, George Halas, Sr., executed a stock exchange agreement on behalf of the testamentary trusts, which received 183 shares of class C common stock in the Delaware corporation in exchange for their 30.5 shares of common stock in the Illinois corporation. On December 16, 1981, the Illinois Bears was merged into the Delaware Bears. Notice of the reorganization was never given to the guardian *ad litem* or to the beneficiaries.

In his complaint, the petitioner alleged that the estate of George Halas, Jr., was injured in the reorganization by restrictions imposed upon the transfer of stock under the Delaware corporation's certificate of incorporation that were not present in the articles of the Illinois corporation. These restrictions are contained in article six of the Delaware certificate, which provides in pertinent part as follows:

"All shares of Common Stock (including shares which have been transferred in accordance with section (d) of this Article SIXTH) shall be subject to the restrictions on transfer set forth in this Article SIXTH.

(a) *Prohibited Transfers.* Any transfer by or from a holder of any shares of any class of Common Stock of the Corporation ('Shares') or any interest in any Shares, whether voluntarily or involuntarily made, other than in accordance with section (d) of this Article SIXTH shall be a Prohibited Transfer. \*\*\* Without limiting the generality of the above, any transfer of Shares or an interest in Shares made in a manner described below (other than in accordance with section (d) of this Article SIXTH) shall be a Prohibited Transfer:

(i) by way of sale, gift, bequest, devise or other disposition;

(ii) by way of pledge or hypothecation or creation of a security interest (except as consented to in writing by the Corporation);

\* \* \*

(b) *First Refusal Notice.* If a holder of Shares (herein referred to as the 'Transferor') proposes to transfer in any transaction which would constitute a Prohibited Transfer of any Shares or interest therein to any person, firm or entity, such Transferor shall immediately give the First Refusal Notice (as hereinafter defined) to the Corporation.

\* \* \*

(c) *Option of Corporation to Purchase.* If the Corporation wishes to purchase some or all of the Shares that are proposed to be transferred as described in the First Refusal Notice, the Corporation shall give the Acceptance Notice (as hereinafter defined) to the transferor within 60 days after receiving such First Refusal Notice. The 'Acceptance Notice' shall: (A) state that the Corporation shall purchase, pursuant to this provision, some or all of the Shares proposed to be transferred at the First Refusal Price (as hereinafter defined) and on the terms as determined by the Board of Directors specified in the Acceptance Notice, which terms may provide for payment (in whole or

in part) in the form of notes of the Corporation (in the principal amount of the First Refusal Price to be paid), and such notes may provide for principal repayment in equal annual installments over a period of up to 10 years at an interest rate of not less than 9%; (B) state the number of such Shares which the Corporation shall purchase; and (C) specify a date on which the Shares shall be purchased ***.

The 'First Refusal Price' per Share shall be equal to the greater of (A) the offered price per Share in the case of a bona fide written offer or agreement to purchase Shares by a third party *** or (B) the Net Fair Market Value Per Share (as hereinafter defined) ***.

(d) *Permitted Transfers.* Notwithstanding the foregoing, the following transfers shall be permitted ('Permitted Transfers'):

(i) If the Transferor has given the First Refusal Notice to the Corporation, a transfer of any Shares that either (A) were not covered by a timely Acceptance Notice in response to such First Refusal Notice, or (B) with respect to which the Corporation expressly waived by the written consent of a majority of the Board of Directors its option to purchase such Shares hereunder;

(ii) transfers to any transferee or assignee within one or more of the following categories:

(A) the spouse or any lineal descendant of the Transferor,

(B) a person who is a stockholder of the Corporation at the time of the proposed transfer or any lineal descendant of the such stockholder of the Corporation or the spouse of such stockholders, or

(C) the trustee of any trust for the sole benefit of the Transferor and/or any person described in (A) and (B) above, provided such trustee is either a bank or trust company or a person described in either (A) or (B) above (or a parent of the Transferor or the Transferor's spouse);

(iii) transfers to the Corporation pursuant to section (c) of this Article SIXTH; or,

(iv) transfers to such other transferees as the Board of Directors may approve, subject to such conditions as the Board of Directors may reasonably require."

In contrast, the articles of the Illinois corporation imposed no restrictions upon the transfer of stock.

Following a bench trial, the trial court held that George Halas, Sr., breached his fiduciary duties by failing to give notice of the reor-

ganization to the guardian *ad litem* in violation of the "Chuhak order" and by failing to protect the interests of Stephen and Christine in the reorganization. The court further held that the executor was obligated to give notice irrespective of the "Chuhak order." In arriving at its conclusions, the trial court found, *inter alia*, that the reorganization: (1) permitted Halas, Sr., and Virginia McCaskey to "freeze" the values of their estates for estate tax purposes for the benefit of the 13 grandchildren, 11 of which are the children of Virginia McCaskey; (2) preserved ownership in the Bears in the Halas, Sr., and McCaskey families, whose members were salaried employees, while Stephen and Christine were nonsalaried minority shareholders; (3) terminated the subchapter S tax status of the Bears which was beneficial to the estate; (4) imposed restrictions on the transfer of stock which were nonexistent in the old corporation, thereby creating a chilling effect on the estate's ability to sell its interest in the Bears; and (5) subordinated the estate's class C stock to the class A and class B stock in dividend and liquidation rights. Because there were sufficient votes to bring about the reorganization without the votes of the shares held in trust for the benefit of Stephen and Christine, the trial court declined to rescind the reorganization or declare it void. The trial court held, however, that there was insufficient evidence to ascertain damages and it *sua sponte* reopened the case for presentation of additional evidence of damages and mitigation of damages.

Prior to the second hearing, the estate received an offer from Neil Bluhm and Judd Malkin of JMB Realty Company to purchase its Bears stock and skybox partnership interest for $17.5 million. This amount was payable over a two-year period with interest at $9\frac{1}{4}\%$ interest. Their offer had a present value of $15 million of which $500,000 was allocated to the skybox partnership interest. The Bears exercised its right of first refusal for the stock, but not for the partnership interest in the skyboxes. Following the second hearing, the trial court found petitioner's evidence of damages to be "uncertain" and held that damages were "not proved to a reasonable degree of certainty." The trial court, therefore, awarded petitioner $1 in nominal damages. The trial court further denied the petitioner's request for attorney fees and costs.

The record reveals the following evidence pertinent to the issue of damages. The Chicago-based financial consulting and valuation firm, Duff & Phelps, Inc. (Duff & Phelps), prepared an appraisal report placing the fair market value of the prereorganization Bears at $16.5 million or $106,450 per share. Based on these figures, Duff & Phelps placed the fair market value of the estate's shares at $3.247 million.

Duff & Phelps also prepared an appraisal of the post-reorganization Bears and concluded that the stock's value remained unchanged after the reorganization.

Mr. Nathaniel Weiner, an attorney and investment consultant, testified that the right of first refusal creates an obstacle between the owner and the potential buyer that can become a roadblock. He explained that a prospective purchaser cannot be sure he has made a deal when he agrees to terms with the owner. Because a prospective purchaser interested in buying an ownership interest in a closely held corporation such as the Bears must engage in a fair amount of preparatory work involving some expense, the right of first refusal makes it more difficult to market the shares. Weiner further testified that the 60-day waiting period can have a negative effect on the ability to market the shares depending on the volatility of the financial markets and the purchaser's need for financing. He also stated that the provision permitting the Bears to purchase some or all of the shares offered for sale enables the corporation to interfere in transactions it deems undesirable at a low cost to the corporation by using its option to purchase a small number of the shares offered for sale where the purchaser is interested in purchasing the entire block. Weiner concluded that the estate's stock decreased in value by 20% to 40%.

Mr. Arthur Rosenbloom, an investment counselor and financial analyst, concluded that the estate's shares depreciated in value by 23% to 27% as a result of the reorganization. His opinion was based on the following. He testified that the right of first refusal with its 60-day waiting period diminished the stock's value by 2% to 3%. Rosenbloom further testified that the prohibited transfers diminished the value of the stock by 5% to 7%. Finally, Mr. Rosenbloom calculated that the provision entitling the Bears to issue a 10-year installment note at 9% upon exercising its right of first refusal diminished the value of the stock by 16% to 17%. On cross-examination, however, Rosenbloom conceded that the 60-day waiting period might not have any impact upon the value of the estate's stock in view of the time it takes for the National Football League (NFL) to approve a transaction. He further failed to consider that the Bears could pay for a shareholder's stock in a manner different than a 9% note payable over a 10-year period. Rosenbloom agreed that if a potential purchaser's offer was itself based on a deferred payment plan, use of a 9% note payable over 10 years might subject the Bears to the risk that a court could find that the corporation's offer failed to match the prospective purchaser's offer. Rosenbloom also admitted that the 9% interest rate

that the Bears could use to finance a purchase of shares pursuant to the right of first refusal would be beneficial to the children if another stockholder were selling. Rosenbloom further agreed that the right of first refusal is beneficial to a shareholder or prospective purchaser who is interested in increasing his proportionate interest in the Bears since the total number of outstanding shares decreases when the corporation exercises its right of first refusal. He further admitted that he did not consider that the estate's class C stock was given dividend preferences or that all accrued "Base Annual Dividends" must be paid before the Bears can exercise its option to purchase stock. Mr. Rosenbloom also failed to consider comparable transactions or provisions in other NFL franchises.

Mr. Edgar Jannotta, a managing partner in an investment banking firm, testified that the restrictions had no impact on the value or marketability of the estate's shares. He testified that a 20% interest in a closely held corporation such as the Bears is difficult to sell because there is no established market and that investors could earn a better return on their investments elsewhere. Jannotta also noted that the Bears own few tangible assets and that transfer of Bears stock is subject to NFL approval. He further testified that there are not many persons in a financial position to bid for the stock. Consequently, Jannotta concluded that if a prospective purchaser is willing to overcome these obstacles, the right of first refusal and its attendant provisions would not make any difference in the value of the stock. Jannotta also stated that the provision restricting the pledging of the shares had no adverse effect because the Bears stock is not acceptable collateral due to the difficulty in selling the stock in case of default.

Mr. Jerry Reinsdorf, chairman of the board of the Chicago White Sox and the Chicago Bulls, testified that he made an offer in 1985 to purchase the stock owned by James Finks and that the right of first refusal did not affect the price of the stock. Charles Brizzolara also testified that the restrictions did not affect the value of his minority interest in the Bears.

Mr. David Bramson, a certified public accountant with the accounting firm of Laventhol & Horwath, testified that the reorganization saved the estate taxes by decreasing the amount of estate tax it would have had to pay upon Halas, Sr.'s death without the reorganization. Bramson further stated that the dividend preferences favoring the class C stock owned by the estate resulted in additional dividends in 1982 and 1984 of $181,211 above what it would have received absent the reorganization and that it received $230,000 in base annual

dividends when the Bears exercised its option to buy the estate's stock. After considering the foregoing evidence, the trial court held that petitioner failed to prove damages and awarded $1 in nominal damages. The trial court also denied the petitioner's request for prejudgment interest and legal costs.

## I. RESPONDENTS' CROSS-APPEAL

We consider first the respondents' cross-appeal as there would be no need to reach the question of damages unless there has been a breach of fiduciary duty. On their cross-appeal, respondents argue that the trial court erroneously held that the failure to give notice constituted a breach of fiduciary duty. The respondents also argue that the trial court's supplemental opinion modified its first opinion, the effect of which was to retract its previous statement that Halas, Sr., failed to protect the interests of Stephen and Christine in violation of his duty of undivided loyalty. The petitioner asserts that the trial judge did not modify his first opinion and that he merely chose not to reiterate all of his findings in exhaustive detail. Because it is unclear whether the trial court intended to modify its earlier findings in its supplemental opinion, we shall first consider whether George Halas, Sr., violated the duty of undivided loyalty.

As trustee, George Halas, Sr., owed a fiduciary duty to Stephen and Christine. (*Collins v. Nugent* (1982), 110 Ill. App. 3d 1026, 1036, 443 N.E.2d 277.) He was obligated to carry out the trust according to its terms (*McCormick v. McCormick* (1983), 118 Ill. App. 3d 455, 462, 455 N.E.2d 103) and to act with the highest degree of fidelity and utmost good faith (*Childs v. National Bank of Austin* (7th Cir. 1981), 658 F.2d 487, 490). A trustee is under a duty to serve the interests of the beneficiaries with complete loyalty, excluding all self-interest, and is prohibited from dealing with the trust property for his individual benefit. (*Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 239, 432 N.E.2d 841; *Childs*, 658 F.2d at 490.) This rule is not, however, without exception. It is well established that a trustee may occupy conflicting positions in handling the trust where the trust instrument contemplates, creates, or sanctions the conflict of interest. (*McCormick*, 118 Ill. App. 3d at 464-65; *Childs*, 658 F.2d at 490; *Morris v. The Broadview, Inc.* (1946), 328 Ill. App. 267, 273, 65 N.E.2d 605. See also *Goldman v. Rubin* (1982), 292 Md. 693, 441 A.2d 713; *In re Flagg's Estate* (1950), 365 Pa. 82, 73 A.2d 411.) The creator of the trust can waive the rule of undivided loyalty by expressly conferring upon the trustee the power to act in a dual capacity, or he can waive the rule by implication where he know-

ingly places the trustee in a position which might conflict with the interests of the beneficiaries. See *Estate of McCredy* (1983), 323 Pa. Super. 268, 297, 470 A.2d 585, 600.

In the instant case, George Halas, Jr.'s will expressly waives the duty of undivided loyalty. The trustee is given the power to elect himself a member of the board of directors of the Chicago Bears, and the trustee is authorized to "deal in an individual capacity or as a director or officer of [the Bears] with himself or herself as an executor hereof or a trustee hereunder." The will further states that the acts of the trustee are binding and conclusive upon the beneficiaries "as though no such relationship or possible conflict of interest existed." Even absent this language, it is clear that George Halas, Jr., authorized his father to occupy conflicting positions as he appointed his father trustee, a position he had to realize might come into conflict with his father's duties and desires as director and shareholder of the Bears. (*Cf. In re Pincus' Estate* (1954), 378 Pa. 102, 111, 105 A.2d 82, 86.) "It is a common situation, for a testator who owns what he deems a good business, to include it in a trust and to appoint as one of the trustees, an officer or employee who is familiar with the business." (See *Conant v. Lansden* (1950), 341 Ill. App. 488, 502, 94 N.E.2d 594, 601.) Here, the trustee was not only the founder and president of the business, he was the testator's father and grandfather of the testator's beneficiaries.

Where a conflict of interest is approved or created by the testator, the fiduciary will not be held liable for his conduct unless the fiduciary has acted dishonestly or in bad faith, or has abused his discretion. (*Tankersley v. Albright* (N.D. Ill. 1974), 374 F. Supp. 538, 543, *aff'd in part & rev'd in part on other grounds* (7th Cir. 1975), 514 F.2d 956; *Goldman*, 292 Md. at 710, 441 A.2d at 723; *In re Pincus' Estate*, 378 Pa. at 111, 105 A.2d at 86.) Further, where the will approves the conflict of interest, the burden of proof remains on the party challenging the fiduciary's conduct as there is no presumption against the fiduciary despite the divided loyalty. (*Goldman*, 292 Md. at 713, 441 A.2d at 724.) Whether George Halas, Sr., abused his discretion or acted in bad faith is a question of fact, and the trial court's findings cannot be reversed unless they are against the manifest weight of the evidence. After the trial below, the trial judge made findings of fact pertaining to the conflicting interests of George Halas, Sr., without considering that his duty of undivided loyalty had been waived in his son's will. Nevertheless, the trial judge indicated that he found that George Halas, Sr.'s participation in the reorganization was motivated by "benevolent intentions."

■ We find that the evidence supports the determination that George Halas, Sr., did not act in bad faith or abuse his discretion during the reorganization. Jerome Vainisi testified that Halas, Sr., intended to treat all of his grandchildren equally, and that he had hoped that Stephen and Christine would become active members in the corporation. The evidence also shows that Halas, Sr., sought to save estate taxes that were to accrue upon his death by "freezing" the value of his shares so that his heirs, including Stephen and Christine, could receive more upon his death. Tax planning considerations were also important to Halas, Sr., for another reason. The minutes of the special meeting at which the reorganization was proposed reveals that Halas, Sr., was concerned with the possibility that the team would have to be sold to pay his estate taxes, citing by example the sale of the Chicago Cubs baseball team by William Wrigley, Jr., to pay the estate taxes on his father's estate.

The evidence further reveals that the reasons for discontinuing the election to be taxed under subchapter S were two fold. First, although the subchapter S tax status of the Bears was beneficial to the estate, a corporation cannot avail itself of the subchapter S benefits where a testamentary trust is a shareholder. Second, a corporation cannot be taxed under subchapter S where the corporation is owned by more than 15 shareholders. Although there were fewer than 15 shareholders before the reorganization, the Bears decided to create a partnership consisting of various holding companies and corporations so that the shareholders, including Stephen and Christine, could take advantage of the marginal tax rates by dividing the skybox income among the various entities in the partnership. Therefore, we find that there was no bad faith or abuse of discretion on the part of George Halas, Sr.

We now turn to the respondents' contention that the failure to give notice of the reorganization was not a breach of fiduciary duty. The trial court, relying upon this court's decision in *In re Estate of Halas* (1987), 159 Ill. App. 3d 818, 512 N.E.2d 1276, held that Halas, Sr.'s failure to give notice was a violation of the Chuhak order. In *In re Estate of Halas* (hereafter *Halas I*), the estate's successor executor, A. Gerson Miller, Stephen and Christine Halas, and the children's mother, Therese Halas, objected to the fee petition of the law firm of Kirkland and Ellis, the original law firm representing the estate. The law firm had requested $957,099.05 in attorney fees and appealed the trial court's award of $535,000. On appeal, this court found, among other findings, that bad faith on the part of Kirkland and Ellis was evidenced by its violation of the Chuhak order. The opinion noted, as

does petitioner, that the stock exchange agreement itself refers to the "conveyance" and transfer of the shares. *In re Estate of Halas*, 159 Ill. App. 3d at 826.

The respondents argue that *Halas I* is not binding and should not be controlling here. The petitioner concedes that *Halas I* has no *res judicata* effect in this case as respondents were not parties in that case or in privity with the parties in that case. The respondents note that this court made no findings in *Halas I* regarding Halas, Sr.'s conduct and assert that *Halas I* was based on a different record that is incomplete with respect to the reorganization and the meaning and intent of the Chuhak order. The respondents also contend that the trial court in the instant case gave an overly broad interpretation of the Chuhak order which had been entered by another judge. They maintain that the trial judge erroneously refused to consider evidence establishing the purpose of the Chuhak order, which they assert was entered only to alleviate Mr. Chuhak's concerns that the grandchildren's shares would be sold pursuant to a section 303 redemption. The record reveals that the trial judge refused to consider extrinsic evidence because he found the Chuhak order clear and unambiguous.

■ We agree that the Chuhak order covered the reorganization and that the failure to give notice was a violation of that order. Where a court order is clear and unambiguous, the intention of the court is determined only by the order itself and is not subject to construction. (*Governale v. Northwest Community Hospital* (1986), 147 Ill. App. 3d 590, 593, 497 N.E.2d 1318.) The Chuhak order states that notice is required if the "Executor decides to sell, convey *** any of the shares of stock issued by [the] Chicago Bears." In order to implement the reorganization, the executor had to convey the children's shares in the Illinois Bears to the Delaware corporation in exchange for newly issued shares of the Delaware corporation. As mentioned earlier, even the stock exchange agreement refers to the transfer of stock as a conveyance. Under the terms of section 2.1 of the stock exchange agreement:

> "Each shareholder *** agree[d] to transfer to the Delaware Company at the Closing the number of shares of common stock of the Illinois Company shown opposite such Shareholder's name on Exhibit A, in exchange for the number of shares of voting Common Stock (either Class A, Class B, Class C or Class D as specified) of the Delaware Company as is shown opposite such Shareholder's name on Exhibit A."

The stock exchange agreement further stated in section 2.3:

"At the Closing and from time to time thereafter, the Shareholders shall execute such additional instruments of conveyance and transfer and take such other action as the Board of Directors of the Delaware Company (the 'Board') may request in order more effectively to complete the exchange contemplated herein."

Further, although *Halas I* has no *res judicata* effect here, it is persuasive authority. The respondents correctly assert that in *Halas I*, this court held only that the trial court did not abuse its discretion in reducing attorney fees. However, in arriving at that conclusion, the court found that the failure to give notice was a violation of the Chuhak order. And although *Halas I* was concerned only with the conduct of Kirkland and Ellis, the court still had to first determine that the transactions made in the reorganization were covered by the Chuhak order before it could find that Kirkland and Ellis acted in bad faith for violating the order. Therefore, it follows that George Halas, Sr., violated the Chuhak order when he failed to give notice to the guardian *ad litem*.

■■ The trial court further stated, however, that George Halas, Sr., was obligated to give full disclosure of the reorganization notwithstanding the Chuhak order. The trial court is correct. It is well established that a trustee owes a duty of full disclosure to the beneficiaries. (*Greene v. First National Bank* (1987), 162 Ill. App. 3d 914, 920, 516 N.E.2d 311; *In re Sedgwick's Will* (1944), 74 Ohio App. 444, 461, 59 N.E.2d 616, 624; G. Bogert, *Trusts & Trustees* §961, at 2-3 (2d ed. rev. 1983).) As stated in the Restatement (Second) of Trusts:

"Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information. As to his duty to render accounts, see §172. In dealing with the beneficiary on the trustee's own account, however, he is under a duty to communicate to the beneficiary all material facts in connection with the transaction which the trustee knows or should know. See §170(2). Even if the trustee is not dealing with the beneficiary on the trustee's own account, he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest." Restatement (Second) of Trusts §173, comment *d*, at 378-79 (1959).

■■ The respondents argue, however, that Halas, Sr., should not be charged with a breach of fiduciary duty because there was no evi-

dence of bad faith, and he was following advice of counsel. Respondents maintain that Halas, Sr., was doing what he believed was in the best interests of the beneficiaries as his only motive for concealing the reorganization was to avoid any delays so that the children would be able to benefit from the estate tax savings that the reorganization would afford them upon his death. According to respondents, Halas, Sr., had anticipated that the children's mother would challenge the reorganization because she had previously instituted litigation against her former husband's estate on behalf of the children. These contentions are without merit. Professor Scott states the following on this point:

> "Where the trustee makes a mistake of law as to the extent of his duties or powers as trustee, it is no defense that he relied upon the advice of an attorney, even though the attorney was competent or the trustee reasonably believed that he was competent. *** The subjection of the trustee to liability where he is not at fault in making the mistake may seem harsh. He can, however, escape liability by submitting the matter to the court for its instructions. If he is in doubt as to his duties or powers, he can thus avoid the risk of acting on his own opinion or on that of his attorney." (3 A. Scott, *The Law of Trusts* §201, at 221 (Fratcher 4th ed. 1988).)

(See also Restatement (Second) of Trusts §201, comments *b, c* (1959).) Accordingly, we conclude that George Halas, Sr., breached his fiduciary duty when he failed to give notice of the reorganization.

## II. PETITIONER'S APPEAL

Petitioner appeals from the trial court's award of $1 in nominal damages and its denial of attorney fees and costs. When a breach of trust is established, the trustee is liable for: (1) any loss or depreciation in value of the trust; (2) any profit made by him through the breach of trust; or (3) any profit which would have accrued to the trust absent the breach of trust. (Restatement (Second) of Trusts §205 (1959).) The claimant carries the burden of proving damages to a reasonable degree of certainty, and evidence of damages cannot be remote, speculative, or uncertain. (*Rosos Litho Supply Corp. v. Hansen* (1984), 123 Ill. App. 3d 290, 300, 462 N.E.2d 566.) Where a party establishes a right to damages, but fails to prove damages, only nominal damages are recoverable. (*Rosos Litho Supply Corp.*, 123 Ill. App. 3d at 300.) On appeal following a bench trial, a reviewing court cannot reverse the trial judge's determination of damages unless that determination is against the manifest weight of the evidence. *Jones v. Her-*

*itage Pullman Bank & Trust Co.* (1987), 164 Ill. App. 3d 596, 603, 518 N.E.2d 178; *Schoenberger v. Chicago Transit Authority* (1980), 84 Ill. App. 3d 1132, 1136, 405 N.E.2d 1076.

 The petitioner argues that the trial court erred in limiting the measure of damages to the depreciation of the estate's stock, and that he was entitled to present evidence on the gain realized by George Halas, Sr., as a result of his breach of fiduciary duty. The record shows, however, that petitioner never attempted to present evidence relating to this theory of damages, nor did petitioner seek a ruling by the trial court on this point. If an issue is not argued before the trial court, it cannot be argued for the first time on appeal. *Printback, Inc. v. Container Technologies, Inc.* (1984), 124 Ill. App. 3d 568, 575, 464 N.E.2d 298.

 The petitioner further contends that the trial court erroneously set the time at which damages must be measured and that as a consequence of that error, the trial court erred in holding that petitioner "failed to establish a proper basis from which damages can be computed." This contention is without merit, however, as the petitioner misconstrues the trial court's supplemental opinion. Read in its entirety, the trial court's supplemental opinion shows that the trial court found that the petitioner failed to meet his burden of proof. The trial judge did not reject any particular period of time for measuring damages. He stated that damages may be measured by the values of the Bears stock with and without the restrictions as of the time of the breach or within a reasonable time thereafter. The trial court accepted the value of the unrestricted stock in 1981 as determined by Duff & Phelps. The trial court found, however, that the analysis of the petitioner's expert, Mr. Rosenbloom, regarding the value of the restricted stock after the reorganization in 1981 was uncertain and, therefore, damages were not proved to a reasonable degree of certainty. The trial judge also indicated that he accepted the purchase price for the sale of James Finks' stock in 1985 and the purchase price for the sale of the children's stock in 1988 as the value of the restricted stock in 1985 and 1988. However, the trial court found that petitioner failed to establish what the value of the stock would have been in 1985 or 1988 had the reorganization never taken place. The trial court therefore awarded $1 in nominal damages. The trial court never indicated any preference for one valuation date over that of any other and did not restrict petitioner to any particular time for measuring damages.

 The question then is whether the trial court's award of $1 in nominal damages is against the manifest weight of the evidence.

Where there is conflicting evidence, it is within the province of the trial judge, as trier of fact, to weigh the evidence. (*Schoenberger*, 84 Ill. App. 3d at 1136.) For a judgment to be found to be against the manifest weight of the evidence, the appellant must present strong and convincing evidence sufficient to overcome the evidence existing in favor of the appellee. (*Schoenberger*, 84 Ill. App. 3d at 1136.) In the present case, the trial judge found many flaws in Mr. Rosenbloom's analysis of the diminution in value of the estate's stock. Rosenbloom determined that the right of first refusal diminished the estate's stock by 2% to 3%. In making that determination, however, Rosenbloom failed to consider that a right of first refusal is advantageous to someone who wanted to increase his proportionate interest in the Bears. Rosenbloom also did not examine the offer to purchase the estate's shares by Neil Bluhm and Judd Malkin. Their offer to purchase the shares was conditioned upon obtaining a secondary right of first refusal for Bears stock, indicating that rights of first refusal can be considered a benefit rather than a detriment. There was also additional evidence that the typical waiting period for NFL approval for such transactions was rarely less than 30 days and, therefore, the 60-day waiting period within which the Bears could exercise its right of first refusal was relatively insignificant. Rosenbloom also failed to take into account the dividend preferences favoring the estate and that base annual dividends must be paid before the Bears can exercise the right of first refusal. Rosenbloom also determined that the prohibited transfers, *i.e.*, pledging stock, diminished the value of the stock by 5% to 7%. The trial court rejected this conclusion, noting that James Finks had testified that the restrictions did not have any adverse effect on his ability to sell his shares at a fair price. Jerry Reinsdorf, who had made the offer to purchase James Finks' stock in 1985, testified that the article six restrictions had no effect on his bid to purchase the stock. Rosenbloom further testified that the installment provision diminished the stock's value by 16% to 17%. However, Rosenbloom conceded that the Bears could match the refusal price on terms different than those expressed in article six. He admitted that if an offer itself was based on installment payments, the Bears might not be deemed to have matched the offer if it utilized the terms in the installment provision in exercising the right of first refusal. We therefore conclude that the trial court's determination is not against the manifest weight of the evidence.

 ██ The petitioner also contends that the trial court erred in denying attorney fees and costs. Citing *In re Estate of Corrington* (1888), 124 Ill. 363, 369, 16 N.E. 252, and *Marshall v. Coleman*

(1900), 187 Ill. 556, 586, 58 N.E. 628, petitioner maintains that George Halas, Sr., should be surcharged for the legal expenses incurred by the beneficiaries as a result of his wrongdoing. In *In re Estate of Corrington*, it was stated: "If the willful misconduct of the executor, or his gross negligence in conducting his trust, rendered litigation necessary for the preservation of the rights of the distributees, it is manifestly just that he should bear the expense, rather than it should fall upon them." (*In re Estate of Corrington*, 124 Ill. at 369.) As the court in *In re Estate of Corrington* noted, however, the decision to award attorney fees and costs is within the sound discretion of the trial court. (*In re Estate of Corrington*, 124 Ill. at 369.) Based on his finding that George Halas, Sr., acted with "benevolent intentions," the trial judge refused to award attorney fees and costs. Under the facts of this case, we do not find that the trial court's denial of attorney fees and costs was an abuse of discretion.

For the foregoing reasons, we affirm the judgment of the circuit court.

Judgment affirmed.

RIZZI and WHITE, JJ., concur.